[S. F. No. 10774. In Bank.—September 21, 1925.]

MRS. GALIPSA HATZAKORZIAN, as Administratrix, etc., Appellant, v. RUCKER-FULLER DESK COMPANY (a Corporation) et al., Respondents.

[1] APPEAL—FINDINGS—VERDICT—EVIDENCE. — The rule by which ap- pellate courts must be guided in passing upon the question whether findings of fact or verdicts of juries are sufficiently supported by the evidence is this: That where an honest difference of opinion between men of average intelligence can arise as to the effect of the evidence—that is, if the evidence is such as that different conclusions upon the matter can rationally be drawn from the evidence—then the case presented is one for the jury or the court, if the questions of fact be submitted to its arbitrament.

[2] NEGLIGENCE — PEDESTRIANS — RIGHT TO TRAVEL UPON PUBLIC HIGHWAY.—Pedestrians have a right to travel anywhere upon a public highway, and it is, therefore, not negligence in them to do so. This is the common-law rule and our legislature has not changed or modified it.

[3] ID.—APPROACHING VEHICLE—DUTY OF PEDESTRIAN TO LOOK BACK FOR.—A pedestrian is under no legal duty to look back or watch

---

1.  See 2 Cal. Jur. 918; 2 R. C. L. 193.
2.  See 3 Cal. Jur. 870.
3.  See 3 Cal. Jur. 882.

behind to see whether he or she is in danger of being struck or run down by any vehicle approaching him or her from the rear.

[4] ID.—CARE REQUIRED OF PEDESTRIANS.—Pedestrians, as is true of every person who travels over the highways by whatsoever means or mode, must exercise reasonable or the due amount of care, considering the conditions existing as to the highways, for their own safety. If they fail in the exercise of such care and themselves thereby contribute proximately to the cause of any injury they may sustain at the hands of one having an equal right to use the highways, or if such failure is the sole cause of the damage they have suffered, then they have no ground upon which to base just complaint.

[5] ID.—DEATH OF PEDESTRIAN — ACTION FOR DAMAGES — CONTRIBUTORY NEGLIGENCE—FINDINGS—EVIDENCE.—In this action for damages for the death of a person caused by being struck from the rear by an automobile while walking on a public highway, there is no evidence whatever tending to show that the deceased was guilty of contributory negligence or any negligence at all, and, therefore, the finding that the deceased was negligently walking on said public highway and was walking on said highway without giving or paying attention to the traffic on said highway or taking any care or precaution for his safety in the position in which he had placed himself, is wholly without evidentiary support.

[6] ID.—EVIDENCE — USE OF REASONABLE CARE BY PEDESTRIAN FOR OWN SAFETY — PRESUMPTIONS. — In such action, where (casting aside, as presumptively the trial court did, the testimony of one who was walking slightly ahead of deceased as to where and how the deceased was walking when struck by the automobile) the record furnishes no information as to where on the highway the deceased was walking, or whether he* was or was not, while so walking, exercising reasonable case for his own saftey under the peculiar circumstances and conditions by which he was then surrounded, the presumption is that the deceased, while walking on the highway, was, at all times, exercising the requisite degree and amount of care for his own safety and preservation.

[7] ID.—PRESUMPTIONS—EVIDENCE. — The presumption that deceased, while walking on the highway, was, at all times, exercising the requisite degree and amount of care for his own safety and preservation, is subject to be controverted, but until controverted it is evidence in accordance with which the jury or the court is bound to decide.

---

4.   Duty of operator of automobile and pedestrian to use care, note, 51 L. R. A. (N. S.) 989. See, also, 3 Cal. Jur. 877.

6.   See 3 Cal. Jur. 966.

[8] ID.—SECTION 22, MOTOR VEHICLE ACT—STATUTORY CONSTRUCTION. The language in section 22 of the State Vehicle Act (Stats. 1919, p. 220) to the effect that a person operating a motor vehicle shall operate or drive the same in a "careful and prudent manner and at a rate of speed not greater than is reasonable and proper," is relative and contemplates the peculiar circumstances and conditions under which a car may be operated over a public highway at a particular time—whether it be after nightfall and dark or in the daytime and light, the width of the highway and whether it is one which, by reason of its connections, is or may naturally be expected to be at all times subject to a heavy or light traffic; in other words, said section requires the exercise of that amount of care in driving a motor vehicle over the highways which the circumstances or conditions of the particular occasion exact, having in view the character of the highway and the use to which it is then being put.

[9] ID.—EVIDENCE—DEGREE OF CARE REQUIRED OF DRIVER OF AUTOMOBILE.—In such action, where the narrowness of the unpaved portion of the highway, the darkness of the night, and the blinding of the driver of the automobile which struck deceased by the glare of the lights reflected from the headlights of an approaching machine, made the highway over which the driver was traveling one beset by danger of an extraordinary character from the time his vision became so obscured as to make it impossible for him to see plainly the road before him to the time that he struck the deceased, the ordinary care with which the driver was charged in driving his car over the highway required such an amount of such care as was commensurate with the exactions of the extraordinary dangerous circumstances under which he was then operating his car.

[10] ID.—DUTY OF DRIVER OF AUTOMOBILE WITH RESPECT TO PEDESTRIANS.—As a part of the reasonable precaution which the law enjoins upon the driver of an automobile to use is the necessity of making certain that foot-passengers are aware of the rearward approach of the vehicle, that the vehicle itself is at such a distance from the pedestrian as to avoid running over him in his sudden panic from surprise at knowledge of its unexpected approach, and, finally, that the vehicle is under such control as that it may be stopped promptly.

[11] ID.—ANTICIPATION OF PRESENCE OF PEDESTRIANS ON HIGHWAY—DUTY OF DRIVER.—It is the duty of a driver of an automobile to anticipate the presence of pedestrians upon the highway over which he is thus traveling.

9.   See 3 Cal. Jur. 871.
10.   See 2 R. C. L. 1186.

[12] ID.—CONDUCT OF DRIVER—EVIDENCE.—In such action, the evidence shows that, from the time the glare from the lights of an approaching car first reflected into the defendant driver's eyes, he proceeded on until he struck and killed the deceased with a degree of indifference or recklessness as to the rights and safety of others who might be ahead of him on the highway closely approaching, if not amounting, under the circumstances, as revealed by his own testimony, to gross negligence.

[13] ID.—DECLARATIONS OF DECEASED IMMEDIATELY PRIOR TO COLLISION—ADMISSIBILITY OF.—In such action, the statement of a witness, who was accompanying deceased at the time the latter was struck and killed, to the effect that, shortly before deceased was struck, the deceased, who, the witness said, was then walking on the unpaved part of the road, kept warning and admonishing the witness to keep off the "paved highway," as probably "somebody hit you," was relevant and competent, if not under the rule of *res gestae,* because it tended to disclose that the deceased had in his mind and fully realized, as he was walking along or over the highway just before he was struck, the perils or dangers of walking over the highway in the darkness of night, and further tended to show that, while thus engaged, he was exercising due care for his own safety.

[14] ID.—EVIDENCE—BODILY OR MENTAL FEELINGS OF PEDESTRIAN.— Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence.

[15] ID.—EVIDENCE.—In such action, it was pertinent cross-examination as to a relevant matter for the plaintiff to ask the defendant driver whether he looked around the right or left side of his windshield to see whether he could discern an object before him while the glare from the approaching automobile still reflected through the windshield of his car, and also whether he was anticipating that he might meet or overtake a pedestrian or other object on the highway.

---

(1) 38 Cyc., p. 1540, n. 47. (2) 12 C. J., p. 191, n. 72 New; 29 C. J., p. 647, n. 51. (3) 29 C. J., p. 657, n. 45, p. 658, n. 62. (4) 29 C. J., p. 658, n. 58, 59. (5) 29 C. J., p. 668, n. 10. (6) 22 C. J., p. 94, n. 74; 29 C. J., p. 666, n. 82 New; 28 Cyc., p. 47, n. 10. (7) 22 C. J., p. 95, n. 77, p. 157, n. 40, 41; 28 Cyc., p. 34, n. 84. (8) 28 Cyc., p. 34, n. 84; 29 Cyc., p. 428, n. 78, 79, p. 429, n. 80. (9) 28 Cyc., p. 27, n. 23. (10) 28 Cyc., p. 28, n. 32, 33. (11) 28 Cyc., p. 29, n. 35. (12) 28 Cyc., p. 47, n. 20. (13) 28 Cyc., p. 47, n. 20. (14) 22 C. J., p. 279, n. 30, 31, p. 281, n. 50, 51. (15) 40 Cyc., p. 2505, n. 97.

13. See 10 Cal. Jur. 1124; 10 R. C. L. 989.
14. See 10 Cal. Jur. 1073.

APPEAL from a judgment of the Superior Court of Fresno County. J. E. Woolley, Judge. Reversed.

The facts are stated in the opinion of the court.

Ohannesian & Ohannesian and Theodore M. Stuart for Appellant.

Frederick W. Docker, Sloss, Ackerman & Bradley and Bradley & Supple for Respondents.

HOUSER, J., *pro tem.*—This cause was ordered to be transferred to this court after decision by the district court of appeal, third district, for the reason that it was deemed advisable to give further study to the questions involved herein, and particularly to the issues of negligence on the part of the defendants and the alleged contributory negligence of plaintiff's intestate.

After further consideration we are in accord with the views expressed by Mr. Justice Hart in the opinion written by him for the district court of appeal. It is as follows:

"This is an action for damages for wrongfully causing the death of plaintiff's intestate. The case was tried by the court, without the aid of a jury, and findings and judgment were in favor of the defendants. The plaintiff appeals.

"The complaint alleges that, on the 3d day of September, 1921, the deceased, while walking in a northerly direction 'upon the extreme right-hand side of a public highway running between the town of Easton and the City of Fresno, in the County of Fresno, . . . ' and not far distant from the town of Easton, was run into from the rear and fatally injured by an automobile driven by the defendant Kennell; that said Kennell was then and there the employee, servant and agent of the defendant corporation; that said Kennell, immediately before and at the time of said automobile collided with deceased, was driving and operating said machine in a careless and negligent manner, and that by reason of such careless and negligent driving the collision occurred, and that as a result thereof bodily injuries were inflicted upon deceased from the effect of which he died. The complaint further states that the deceased left surviving him his

wife, the plaintiff herein, and five minor children, all entirely dependent upon him and during the lifetime of the deceased receiving from him care, nurture, maintenance, support, etc.

"The defendants, jointly answering the complaint, denied the allegations thereof, and alleged affirmatively that the accident and the consequent death of the deceased were wholly caused by the deceased's own negligence. At the time of the trial, however, the defendants, by leave of the court, amended their answer by pleading the defense of contributory negligence, alleging that the injuries sustained by the deceased, and resulting in his death, were contributed to by his own negligence.

"The court found that, on the night of the 3d of September, 1921, the deceased was walking in a northerly direction on the right-hand side of the public highway above referred to; that 'it is true that said H. Hatzakorzian was carelessly, recklessly and negligently walking on said public highway in the night time and in the darkness of the night directly in the path of traffic moving on said highway in the same direction in which the said Hatzakorzian was walking with his back to the direction of traffic on said highway without giving or paying any attention to the traffic on said highway or taking any care or precaution for his safety in the position in which he had placed himself; that said H. Hatzakorzian was familiar with and knew the use of said highway and the danger to which he negligently and carelessly exposed himself'; that the automobile which collided with and struck deceased, inflicting injuries which resulted in the latter's death, was driven and operated at the time by the defendant Kennell, but that at said time said Kennell was not driving said car in a careless and negligent manner; that the injuries to and the death of deceased by reason of the collision were not caused by 'any wrongful, careless or negligent acts of the defendants or either of them'; that the injuries and the consequent death of the deceased were solely and proximately due to and caused by the latter's own carelessness and negligence, and 'without any fault on the part of the defendants, or either of them.'

"There are several assignments of error, but the point particularly stressed by the plaintiff is that the evidence does not support the findings, or, in other words, that the evi-

dence indisputably shows that the accident and resultant death of the plaintiff's intestate were directly caused by the negligence of the defendants. This contention will necessitate, of course, an extended examination of the evidence.

"The highway upon which the accident occurred is known as Elm avenue and runs practically in a straight line north and south. The paved portion of the highway was at the time of the accident sixteen feet in width. It was made of gravel, asphalt and sand, and is what is known as 'black base.' The shoulders of the highway on both sides thereof, which are made of dirt common to the locality in which the highway is situated, are approximately ten feet in width on the one side and likewise nine feet on the other and have a gradual slope toward the fence or pits on either side. For seven feet, approximately, the slope from the paved portion is practically level, and at the end of the seven feet it breaks sharply.

"The defendant Kennell and a young man named Suran Ohannesian were the only persons present at the scene of the accident when it occurred, and consequently theirs was the only testimony presented at the trial that reflected any light on the circumstances under which the collision was brought about.

"Suran Ohannesian, to whom we will hereinafter refer as Suran, was the companion of and, at the time of the collision, was walking along the highway with the deceased, the former walking about twenty feet ahead of the latter.

"The deceased who, at the time of his death, was thirty-nine years of age, a farmer and owned and operated a farm some twelve miles south of the city of Fresno. To reach his farm from Fresno it was necessary to pass through or near the town of Easton.

"The story told by Suran of the misadventure may thus be summarized: On the 3d day of September, 1921, near the hour of 8:30 P. M., the deceased, accompanied by Suran, the latter's mother, sister and brother-in-law, left the city of Fresno in an Overland automobile together via Elm avenue for the ranch of the deceased. On reaching a point about a mile north of Easton some part of the machinery of the car in which they were riding got out of order, with the result that the machine stalled. After repeated un-

availing attempts to start the car, the deceased, assisted by
others of his party, moved it from the paved to the unpaved
portion of the highway on the west side thereof.  Suran and
the deceased then started for Easton to telephone a friend
in Fresno and request him to go to where their car was and
tow it to the former place.  They were conveyed to Easton
by a passing autoist, going in the direction ·of that town.
Arriving in Easton, deceased telephoned his friend at Fresno
and immediately thereafter he and Suran started on their
return to the point at which they had left the car.  It was
at this time near the hour of 9 o'clock, the night was very
dark and there were no lights on the highway.  They were
walking in a northerly direction and on the right-hand side
of the highway, Suran walking and keeping ahead of de-
ceased a distance of about twenty feet.  Suran testified that,
as they were walking along they carried on a conversation,
the deceased frequently making some jocular remark about
the situation they were in because of the stalling of their
machine, and that both would laugh at the remark.  A' num-
ber of cars passed them, going in the same direction, 'and,'
Suran proceeded, 'I asked for a ride from the cars that
went north to get to the car quicker and they wouldn't stop.
. . . And I would keep off the highway and I would always
look back and see if there was a car coming to ask for a ride,
. . . , and I would see Mr. Hatzakorzian off the paved high-
way, too.  When we were about a half a mile north (of
Easton) I heard a crash and looked back.  Suddenly I was
thrown back and fell about ten feet and there was a hole
there that I fell in and I had a hurt, on my knee, and when
I stood up I couldn't stand.  I sat down and I saw the car
that had hit us still keeping on and I hollered to him to stop,
that he had hurt somebody, but he wouldn't stop and kept
on going.· I noticed another car come back and stop near
us and I saw that Mr. Hatzakorzian's body was laying
about three or four feet in front of me and it was all
crushed up and blood was covered,' meaning, as may be as-
sumed, that the deceased was covered with blood.  The
'other car,' which Suran said, 'come back and stopped near
us,' turned out to be the car of Kennell, who, after striking
the deceased and Suran, proceeded a short distance up the
road and then turned and returned to the spot where the
accident occurred.  Suran stated that, just as Kennell's car

passed him going north, he (Suran) noticed that the tail light on the former's car was not on, and that he observed, when Kennell returned to the place of the accident, the front lights of his car were not on. Before reaching the spot where the mutilated body of Mr. Hatzakorzian lay upon the highway (said Suran) Kennell stopped his car, got out and attempted 'to fix the fender which was bended on the wheel. He fixed it,' continued the witness, 'and he got inside, lit the lights, turned around and came to where we were.' On cross-examination, Suran repeated that, while they were walking along the highway, as above described, he frequently looked back to see if any cars were coming, that he thought he looked back every few seconds, and when he saw a car 'coming' he would keep his eyes on it; that the last time he looked back, which was just before deceased was struck down, he saw no car back of them or traveling in the direction in which they were going; that he did not see the car strike deceased; that he could not say whether or not the deceased looked back and saw the car of Kennell approaching him from the rear; that when he (witness) was struck he was two or three feet off the paved part of the highway and on the dirt portion thereof; that when he got on the highway, after having been struck, he saw the body of the deceased near the center of the highway. Suran further testified (on redirect) that, prior to the accident, he had had a year's experience in the driving of automobiles and that from such experience he was able to give it as his opinion that Kennell, when he struck witness, was driving at the rate of between thirty and thirty-five miles an hour.

"Defendant Kennell left the city of Fresno at or near the hour of 3 P. M. of the day of the accident for Easton, going by way of Elm avenue, over which he had previously never traveled. The object of his visit to Easton was to negotiate the sale of chairs for the high school at that town and for that purpose he went out to interview the principal of said school. The latter resided about two miles west of Easton. Kennell arrived at the residence of the principal about 8 P. M., and after attending to the business for which he went there, and near the hour of 9 o'clock P. M., started on his return to Fresno. After reaching Elm avenue he turned his car to the north, traveling about 100 feet with his car in second gear and then put it in 'first high' and so operated

the car until the collision occurred. He testified that he had had three years' experience in operating automobiles; that, as the night was very dark and he had never passed over Elm avenue before, he 'was driving slowly, at a fair rate of speed, between twenty-five and thirty miles, when a machine with glaring lights, was coming towards me, and I slowed down somewhat until I passed it, but just as I passed the machine I struck the deceased and swerved to the left of the road and also felt another obstacle, which, I presume, was the young man who testified. Then I stopped and looked back, but it was so dark—I was afraid to back up— I didn't know just where the bodies might be—that is, if they had fallen down or whether they were able to get up or not; so I kept going until I came to a place where I could turn around, which was a gate, I presume 200 feet down from where the accident occurred.' Kennell found, on attempting to turn his car, that the right fender thereof was twisted and bent over the right front wheel, so that he could not make the turn. He thereupon alighted, and straightened the fender so that he could turn the car. Returning to the spot where the collision occurred, he found that Hatzakorzian had been killed and Suran slightly injured. He placed the body of the deceased in his car, and accompanied by Suran, went to the city of Fresno, taking the dead body to the morgue and Suran to the Emergency Hospital. Kennell further testified that from the time he entered the highway from the road leading from the residence of the principal of the school to the time of the collision his lights, which, he stated, were readjusted a few days before the accident, were on, and that he did not, at any time, after entering the highway, leave the paved portion thereof; that the deceased was struck by the right-hand side of the machine; that when he struck Suran the right-hand side of his car was 'about a quarter of the way on the highway—that would be about four feet.'

"Kennell, with a deputy sheriff and a deputy coroner, returned to the scene shortly after he delivered the body of the deceased at the morgue, and by the aid of spotlights the portion of the highway where the collision took place was inspected. He said he did not see tread marks of the wheels of a car anywhere thereabouts on the unpaved portion of the highway, nor blood on that portion thereof.

"On cross-examination, Kennell said that, when returning to Fresno on the highway, he had 'ample light to drive by'; that an object in front of him would be visible from his car at a distance of 75 or 100 yards. 'To see the road clearly, that is, extremely clearly,' he said, he could see an object before him a distance, 'may be 150 to 200 feet.' 'Q. So that the light you had that evening lighted up the roadway so that you saw a distance between 150 and 200 feet, is that right? A. Yes, sir. Q. And you were able to discern any obstacles that might come in your way by reason of the light you have? A. Yes.' He stated that in going towards the highway from the home of the school principal, his rate of speed was about 15 miles an hour; that on entering the highway, and after going a few feet he increased his speed to about 25 miles an hour. 'Q. You are quite sure not more than that? A. Quite sure. Q. When did you first notice the glaring lights you spoke of on the approaching car? A. I would say that began to obscure my vision— that is, where I could not see the road clearly in front of me, possibly, on, maybe, 100 or 200 feet—I couldn't say for certain—before the accident occurred. Q. So that, for the space of 150 or 200 feet, you couldn't see the road clearly? A. I could see the road clearly. Q. But could you discern any objects on the highway? A. I could discern any kind of a light—You can always see a light through the glare, where you cannot see anything, practically, the color of the highway itself. Q. Anything but a light you couldn't see because of the glare you speak of? A. If approximately the same color as the highway. Q. That evening you didn't see anything? A. I didn't see anything, no. Q. That was due to the glaring lights? A. Yes, sir. Q. As soon as you noticed that the lights were before you so that you could not travel, what did you do, if anything? A. Slowed down somewhat. I might explain there, when I said 20 or 25 miles an hour, I felt possibly I was driving about 25, by taking my foot off of the accelerator, the momentum of the car carried me along till up to the point about 20 miles an hour, so when the accident occurred, I feel that I was going between 20 and 25. Q. Just before the glare of the lights, you were traveling 25 miles an hour? A. I would say approximately that. Q. Probably a little more than that. A. I don't think so. Q. But what precautions did you take

when you first saw the glare of the light, what did you do, anything at all, or merely allowed the car to run—what did you do, if anything, when you saw the glare of this light? A. I slowed down somewhat. As far as taking precaution and anticipating something being there, I didn't anticipate it. . . . Q. Did you put your brake on when you saw this glare was interfering with your sight? A. No, sir. Q. Did you turn your gas off? A. I took my foot off the accelerator. Q. Did you turn off the ignition? A. No, sir. Q. You merely allowed the car to run at the rate of speed it was going, carried by its momentum, is that it? A. Yes, sir. Q. How far had you traveled in that condition, with the lights glaring on your windshield before you struck the first obstacle? A. The light was glaring in my eyes and not the windshield. Q. Through the windshield? A. Through the windshield, yes. Q. And how far had you traveled in that condition before you struck the first obstacle? A. I would say anywhere from 100 to 200 feet. Q. And from the point that you started and to the time you struck during that space you were unable to see any obstacle on the road because of this glare through the windshield upon your eyes? A. I could have seen, I believe, anything a short distance from the machine up to the time when I got practically next to the machine, when, as the evidence shows, I couldn't see anything at that time. Q. Due to the glare of the light on the approaching car? A. Yes. Q. How far were you traveling east of the edge of the highway towards the north when that glare showed into your eyes? A. Approximately two feet. Q. That is, the wheel was two feet on the inside, or the fender? A. I should say the wheel would be. Q. And how far does the fender extend to the right of the wheel, the right fender? A. About four to six inches. . . . Q. How far after you had struck the first obstacle did you travel before you struck the second? A. Might be 12 or 15 feet. Q. You were still blinded by the glare of these lights? A. No. The car had passed me, and I had struck deceased just at the time the car passed me. Q. Mr. Kennell, had you examined your brakes that day at all? A. Not that day, no. Examined them at same time the lights were adjusted. Q. Were your brakes in a condition so you could have stopped your car from the time of the glare of the approaching car shone through the window and the time you

struck the first obstacle—did you have sufficient time to do that? A. I believe so, yes. Q. In other words, you could have stopped your car within the space of 150 feet if you wanted to? A. Yes. Q. But you did not? A. No, sir. Q. Was your car in such condition as to the brakes, both as to the emergency and hand brake, to permit you to stop or slow down to avoid the obstacle within the distance covered by your lights? A. You mean could I have stopped from the time I first seen the automobile coming?—Yes. . . . Q. When were you first aware of the fact that you had struck a man, a pedestrian, Mr. Kennell? A. At the time I struck him. Q. You knew at once that you had struck a man A. Yes, sir. Q. After you struck him, how far did you carry the body, if you did? A. I believe it was about 12 or 15 feet, or possibly more. Q. What portion of your car was the body carried along the highway on? A. I believe over the front headlight—the right headlight. . . . From the time I struck him I carried his body down the road about 12 or 15 feet. The body fell off the machine at that time. I felt two wheels pass over the body, and I had the brake on at the time and stopped. I stopped I presume five or ten feet north of where the body fell to the ground from the car. . . . I am not entirely clear whether I came to a dead stop or not, but I know the car was in neutral and I looked behind to see if I could see anything and not being able to, I went on ahead. Q. You threw the clutch into neutral, do I understand, after you dropped the body? A. Yes, sir— that is, after I had stopped practically still, and if I was going at all, I was not going more than two or three or four or five miles an hour. Q. That is, after you had dropped the body? A. Yes, I went into second very slowly and until I could find a place to turn around. . . . Q. Was there anything to prevent you from bringing your car to a standstill at the time the lights glared through the windshield to your face? A. No. Q. But you· didn't stop? A. No.'

"The above embraces a comprehensive as well as an accurate statement of the circumstances under which the accident occurred, so far as the only two witnesses who were present at the scene thereof when it happened knew or could give the circumstances.

"One Blasingame, a deputy sheriff, and one Ross, deputy coroner, who were the officers who returned with Kennell

to the place where the accident occurred, shortly after the body of deceased was delivered at the morgue, made an examination of the highway and the ground where the accident happened. Testifying for defendant, those officers stated that they observed blood spots short distances apart on the paved portion of the highway, but saw no blood on the unpaved portion. One of the officers testified that he observed on the shoulder of the east side of the highway treadmarks of the tires of an automobile, but he expressed the opinion, based on appearances, that they were 'Old marks' or had been made some time prior to the night of the accident. This testimony we do not regard as of particular consequence in the decision of the case.

[1] ''The rule by which appellate courts must be guided in passing upon the question whether findings of fact or verdicts of juries are sufficiently supported by the evidence is this: 'That where an honest difference of opinion between men of average intelligence can arise as to the effect of the evidence—that is, if the evidence is such as that different conclusions upon the matter can rationally be drawn from the evidence—then the case presented is one for the jury or the court, if the questions of fact be submitted to its arbitrament.' (*Firth* v. *Southern Pac. Co.,* 44 Cal. App. 511, 514 [186 Pac. 815, 816].) There is, however, no place for that rule in the instant case. [2] It is settled law that pedestrians have a right to travel anywhere upon a public highway, and it is, therefore, not negligence in them to do so. This is the common-law rule and our legislature has not changed or modified it. (*Raymond* v. *Hill,* 168 Cal. 473, 482 [143 Pac. 743].) [3] Nor is a pedestrian under legal duty to look back or watch behind to see whether he or she is in danger of being struck or run down by any vehicle approaching him or her from the rear. (*Raymond* v. *Hill, supra; Devecchio* v. *Ricketts,* 66 Cal. App. 334 [226 Pac. 11]; *Idemoto* v. *Schneidecker,* 193 Cal. 653 [226 Pac. 922].) [4] Of course, pedestrians, as is true of every person who travels over the highways by whatsoever means or mode, must exercise reasonable or the due amount of care, considering the conditions existing as to the highways, for their own safety. If they fail in the exercise of such care and themselves thereby contribute proximately to the cause of any injury they may sustain at the hands of one having

an equal right to use the highways, or if such failure is the sole cause of the damage they have suffered, then, of course, they have no ground upon which to base just complaint. [5] In the present case, however, there is no evidence whatever tending to show that the deceased was guilty of contributory negligence or any negligence at all. In other words, the finding that the deceased, while returning to the point on the highway where he had left his car, 'was carelessly, recklessly and negligently walking on said public highway' and was walking on said highway 'without giving or paying attention to the traffic on said highway or taking any care or precaution for his safety in the position in which he had placed himself' is wholly without evidentiary support. The testimony of Suran is that the deceased was walking on the unpaved portion of the highway immediately before the instant of time he was struck by Kennell's car. While, for sufficient reasons, as to which this court is not at liberty to enter upon an inquiry to determine whether they are or are not valid, the trial court could, as we must assume that it did, disregard Suran's testimony on that point, still his was the only testimony in the case which tended in the slightest degree to show precisely where the deceased was walking on the highway immediately before he received the mortal injuries. Kennell did not know, for he stated that he did not at any time see the deceased until after the latter was struck and his body carried on the fender of the car a distance of from twelve to fifteen feet. [6] Casting aside, then, as presumptively the trial court did, the testimony of Suran as to where and how the deceased was walking when struck by Kennell, the record furnishes absolutely no information as to where on the highway the deceased was walking, or whether he was or was not, while so walking, exercising reasonable care for his own safety under the peculiar circumstances and conditions by which he was then surrounded. In this state of the case as to the matter now in hand, the presumption is that the deceased, while walking on the highway, was, at all times, exercising the requisite degree and amount of care for his own safety and preservation. (Code Civ. Proc., sec. 1963, subd. 4; *Crabbe v. Mammoth Channel G. Min. Co.,* 168 Cal. 500, 506 [143 Pac. 714, 716]; *Cogdell* v. *Wilmington & W. R. Co.,* 132 N. C. 852 [44 S. E. 618]; *Shannon* v. *Delwer,* 68 Minn. 138

[71 N. W. 14].)   [7] That presumption is, of course, subject to be controverted, 'but until controverted it is evidence in accordance with which the jury (or the court, as in this case) is bound to decide.' (*Crabbe* v. *Mammoth Channel G. Min. Co., supra;* Code Civ. Proc., sec. 1961.) As, therefore, there is no evidence which supports the finding that deceased was guilty of negligence while walking along the highway, or immediately before or at the time he was struck, the said presumption stands undispelled and, consequently, as proof of the fact that the deceased exercised a due amount of care for his own safety at all times while walking on the highway.

"The next question to be considered is whether the finding that Kennell was not driving the automobile 'in a careless and negligent manner,' and that the injuries to and the death of plaintiff's intestate were not proximately caused by 'any wrongful, careless or negligent acts of the defendants, or either of them,' etc., derives support from the evidence.

"Section 22 of the State Vehicle Act (Stats. 1919, p. 220, which was the law in force when the injuries complained of here were received by deceased), provides, in part, as follows: 'Any person operating or driving a motor or other vehicle on the public highways shall operate or drive the same in a careful and prudent manner and at a rate of speed not greater than is reasonable and proper, having regard to the traffic and use of the highway, and no person shall operate or drive a motor vehicle or other vehicle on a public highway at such rate of speed as to endanger the life or limb of any person or the safety of any property.'

"Section 20 (a) of said act (Stats. 1915—carried into the amending statute of 1915 [Stats. 1915, p. 215], Stats. 1919, p. 215), among other things, provides: 'The driver or operator of any vehicle in or upon any public highway shall drive or operate such vehicle in a careful manner with due regard for the safety and convenience of pedestrians,' etc.

"The meaning of the foregoing sections, although in general language, is plain and can hardly be misunderstood by any person of ordinary intelligence. [8] The language of the section first above quoted herein, to wit: 'careful and prudent manner and at a rate of speed not greater than is reasonable and proper,' is relative and contemplates the

197 Cal.—7

peculiar circumstances and conditions under which a car may be operated over a public highway at a particular time —whether it be after nightfall and dark or in the daytime and light, the width of the highway and whether it is one which, by reason of its connections, is or may naturally be expected to be at all times subject to a heavy or light traffic. In other words, said section requires the exercise of that amount of care in driving a motor vehicle over the highways which the circumstances or conditions of the particular occasion exact, having in view the character of the highway and the use to which it is then being put. As is said in 29 Cyc., pages 428, 429: 'The care required must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated from the neglect. The greater the risk of danger the greater must be the care. What is ordinary care in a case of extraordinary danger would be extraordinary care in a case of ordinary danger.'

[9] "Under the circumstances of the present case—the narrowness of the unpaved portion of the highway, the darkness of the night and the blinding of Kennell by the glare of the lights reflected from the headlights of the approaching machine—the highway over which Kennell was traveling was beset by danger of an extraordinary character from the time his vision became so obscured as to make it impossible for him to see plainly the road before him to the time that he struck the deceased. Thus the ordinary care with which Kennell was charged in driving his car over the highway required such an amount of such care as was commensurate with the exactions of the extraordinary dangerous circumstances under which he was then operating his car. The respective rights and duties of drivers of automobiles and other vehicles and of pedestrians have repeatedly been by the courts of this state clearly pointed out. In *Raymond* v. *Hill,* 168 Cal. 473, 482–486 [143 Pac. 743, 748], Judge Henshaw clearly points out and defines those rights and duties. [10] After, in effect, declaring that a pedestrian when using the public highways, may assume that the driver of an automobile approaching the former from the rear will so operate his car as to avoid colliding with or injuring him, and that failure to anticipate omission of such care does not render him negligent (see, also, on the proposition, *Blackwell* v. *Renwick,* 21 Cal. App. 131, 135 [131 Pac. 94];

*Deputy* v. *Kimmell,* 73 W. Va. 595 [Ann. Cas. 1916E, 656, 51 L. R. A. (N. S.) 989, 80 S. E. 919]; Elliott on Streets and Roads, 3d ed., sec. 1088) the court has the following to say with respect to the duty of drivers of automobiles: 'But as a part of the reasonable precaution which the law enjoins upon the driver of an automobile to use, is the necessity of making certain that foot passengers are aware of the rearward approach of the vehicle, that the vehicle itself is at such a distance from the pedestrian as to avoid running over him in his sudden panic from surprise at knowledge of its unexpected approach, and, finally, that the vehicle is under such control as that it may be stopped promptly.'

"The above rule is reasserted in *Randolph* v. *Hunt,* 41 Cal. App. 739 [183 Pac. 358].

"In *Meyers* v. *Bradford,* 54 Cal. App. 157 [201 Pac. 471], in which an application for a hearing by the supreme court was denied, this court, through the late Justice Burnett, approved, as accurately stating the law, the following instruction given at the trial: 'It is part of the duty of the operator of a motor vehicle to keep his machine always under control so as to aviod collisions with pedestrians and other persons using the highway. He has no right to assume that the road is clear, but under all circumstances and at all times he must be vigilant and must anticipate and expect the presence of others. Accordingly, the fact that he did not know that anyone was on the highway is no excuse for conduct which would have amounted to recklessness if he had known that another vehicle or person was on the highway.'

"*Woodhead* v. *Wilkinson,* 181 Cal. 599 [10 A. L. R. 291, 185 Pac. 851], was a case where the driver of an automobile, approaching plaintiff from the rear, ran over and inflicted serious injuries upon her. The case was tried by the court sitting without a jury, and it was found that defendant was negligent in that, when he realized that his vision was obscured by an approaching automobile so that he could not see the road before him, 'he failed to look around the side of the shield.' Complaint was made that said finding was insufficient to support a judgment for damages, the contention being, we assume (the opinion does not state the specific ground of the objection to the findings), that there was no duty cast upon the defendant under such circumstances to 'look around the end of the windshield.' The

court said: 'Obviously, he would be bound as a careful driver to stop as soon as he could reach a place by the side of the road, or to place himself in a position from which he could see the road over which he was driving. He did not stop at once and if, under all circumstances, looking around the end of the windshield was the only way in which he could safely proceed, then he was negligent in failing to adopt that plan. The same reason applies to the finding that he was negligent in failing to observe the highway immediately in front of the car which he was driving.'

[11] "That it is the duty of a driver of an automobile to anticipate the presence of pedestrians upon the highway over which he is thus traveling, is thoroughly settled as a part of the law of the road and is emphasized in *Zarzana* v. *Neve Drug Co.*, 180 Cal. 32, 37 [15 A. L. R. 401, 179 Pac. 203], and in *Reaugh* v. *Cudahy Packing Co.*, 189 Cal. 335, 340 [208 Pac. 125]. In the first named of these cases it is said: 'Aside from the mandate of the statute the driver of a motor vehicle is bound to use reasonable care to anticipate the presence on the streets of other persons having equal rights with himself to be there.'

"In the case last mentioned the court said: 'He (the driver) still remains bound to anticipate that he may meet persons at any point of the street, and he must, in order to avoid a charge of negligence, keep a proper lookout for them and keep his machine under such control as will enable him to avoid a collision with another person using proper care and caution, and if the situation requires he must slow up and stop. (*Kessler* v. *Washburne*, 157 Ill. App. 532; *Zarzana* v. *Neve Drug Co.*, 180 Cal. 32 [15 A. L. R. 401, 179 Pac. 203].)'

[12] "Testing the conduct of the defendant Kennell, in operating his car on the occasion in question, by the rules and principles above set out, it is clear from his own testimony that he disregarded and violated every duty which the law imposes upon drivers of automobiles when driving the same over the public highways: In condensed form, his testimony may thus be recapitulated: 1. He was traveling up to the time the glare reflected from the lights of the approaching automobile at the rate of 25 miles an hour; 2. When the glare struck his eyes he was a distance of between 150 and 200 feet from where he collided with de-

ceased; 3. The glare so obstructed his vision that he was unable to see an object on the highway before him, although his lights were in good condition and under ordinary circumstances he was able by them to discern an object before him at a distance of from 75 to 100 yards; 4. He did not see the deceased until after his car struck him; 5. When the glare first struck his eyes and blinded him, with the result as indicated, he diminished the speed of his car so that thereafter and until he struck deceased, he was traveling at a speed of between 20 and 25 miles an hour; 6. He did not put on his brakes, nor turn off either the gas or ignition; 7. His brakes were in perfect order and he said he could have stopped his car between the time the glare first struck his eyes and the time he struck deceased, but that he did not do so, nor make any attempt to do so; 8. That he was not anticipating the presence of pedestrians on the highway in front of him—in fact, his mind, he himself in effect stated, was not on the matter of whether he might or might not overtake a pedestrian. It is only necessary to compare the foregoing *résumé* of Kennell's own testimony with the requirements of the law with respect to the duties of operators of automobiles when driving over the highways of the state to force the conclusion that, from the time the glare from the lights of the approaching car first reflected through his windshield into his eyes, he proceeded on until he struck and killed the deceased with a degree of indifference or recklessness as to the rights and safety of others who might be ahead of him on the highway closely approaching, if indeed, not amounting, under the circumstances, as revealed by his own testimony, to gross negligence.

[13] "In view of a probable retrial, some of the assignments involving attacks upon rulings as to the admissibility of certain testimony should be noticed herein. The court struck out on motion of defendants a statement by the witness Suran to the effect that, shortly before the fatal collision, the deceased, who, the witness said, was then walking on the unpaved part of the road, kept warning and admonishing Suran to keep off the 'paved highway,' as probably 'somebody hit you.' The testimony stricken out was relevant, and, we think, competent, if not under the rule of *res gestae,* certainly because it tended to disclose that the deceased had in his mind and fully realized, as he was walking

along or over the highway just before he was struck, the perils or dangers of walking over the highway in the darkness of night, and further tended to show that, while thus engaged, he was exercising due care for his own safety. [14] 'Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might .be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light. As independent, explanatory or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury.' (*Travelers' Ins. Co.* v. *Moseley,* 8 Wall. (U. S.) 397, 404, 405 [19 L. Ed. 437; see, also, Rose's U. S. Notes]; see, also, *Mutual Life Ins. Co.* v. *Hillmore,* 145 U. S. 285, 296 [36 L. Ed. 711, 12 Sup. Ct. Rep. 909]; *Belleveau* v. *Lowe Supply Co.,* 200 Mass. 237 [86 N. E. 301]; *Payne* v. *Railway Co.,* 153 Iowa, 445 [133 N. W. 781].) 'A person's mental state of fear is provable by his declarations, unless they are too remote.' (22 C. J., p. 281; see, also, *People* v. *Fong Sing,* 38 Cal. App. 253, 258, 259 [175 Pac. 911], and cases therein cited.) The qualifying language of the rule as it is last stated has no application here, since the declarations of the deceased sought to be shown were, as seen, made but a few minutes prior to the accident, and had reference to just such a contingency as happened. As to the instances of the application of the rule of *res gestae,* see the following cases: *Rogers* v. *Manhattan Life Ins. Co.,* 138 Cal. 285, 290 [71 Pac. 348], and cases therein cited; *Zipperlen* v. *Southern Pac. Co.,* 7 Cal. App. 206, 220 [93 Pac. 1049]; see, also, 2 Starkie on Evidence, 241; Phillips on Evidence, 4th Am. ed., 185.

[15] "It was pertinent cross-examination as to a relevant matter for the plaintiff to ask Kennell whether he looked around the right or left side of his windshield to see whether he could discern an object before him while the glare still reflected through the windshield (*Woodhead* v. *Wilkinson, supra*), and also whether Kennell was anticipating that he might meet or overtake a pedestrian or other

object on the highway. (*Zarzana* v. *Neve Drug Co., supra; Reaugh* v. *Cudahy Packing Co., supra.*)   As to the matter of inquiry first stated, however, the question propounded to the witness was rather indefinite in form.   As to the other matter, the said defendant thereafter admitted that he did not anticipate or think of meeting or overtaking any person or object on the highway in front of him.   The rulings foreclosing proper inquiry into those matters would be erroneous and probably prejudicial under some circumstances.

"There are no other assignments calling for special attention herein."

For the foregoing reasons it is ordered that the judgment be and the same is reversed.

Lawlor, Acting C. J., Richards, J., Seawell, J., Lennon, J., Waste, J., and Shenk, J., concurred.