[Crim. No. 4867.   Second Dist., Div. Two.   Dec. 23, 1952.]

THE PEOPLE, Respondent, v. MERTON CHARLES MISENER, Appellant.

F. Walter French and Donkin & Mulholland for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

MOORE, P. J.—The information herein accuses appellant of the murder of Ann Symington (count I), the murder of Margaret Cramer (count II), and of an assault with a deadly weapon with intent to commit murder upon Paul Mowery Beck (count III). The accused entered pleas of "not guilty as charged in the information" and not guilty by reason of insanity. After a lengthy trial before a jury, verdicts of guilty on all counts were returned with a recommendation of life imprisonment as to the murders. The issue of insanity was subsequently presented to the same jury and that body found appellant to have been sane at the time of the commission of the offenses charged. Appellant's motion for a new trial having been denied, he was sentenced to the state prison for life as to counts I and II and for the term prescribed by law as to count III. The appeal is from the judgments of conviction, and from the order denying a new trial on the grounds discussed below.

### It Was Premeditated Murder

Inasmuch as the only attack upon the judgments is the claim that the proof does not justify verdicts for malicious and premeditated homicides as to counts I and II, a generous narrative of the events preceding appellant's extravagant use of deadly weapons is deemed essential to a full vindication of the jury's implied findings. In March, 1951, appellant departed from his family in Portland, Maine, for Pensacola, Florida, where he visited with Margaret Cramer, whom he had known in the New England metropolis during preceding years. Pursuant to arrangements agreed upon in the southern city, appellant soon located in Los Angeles County where he was joined by Mrs. Cramer about May 1st. Together they occupied an apartment on High Street in Santa Monica until about December 1st, when Margaret moved into the apartment of her friend Ann Symington on 24th Street. While Margaret exhibited a loss of interest in appellant, he continued his fervid pursuit. He met Paul Beck at the Symington apart-

ment on a number of occasions prior to the middle of December. He inquired of Beck relative to his own standing with Margaret and whether Beck thought appellant might effect a reconciliation with her and whether she was interested in any other man.

About December 17th appellant met Louis Nuzzaci in the Symington apartment imbibing alcoholic beverages with Margaret in the living room. Two days later he met Nuzzaci in the market operated by the latter and told him of his recent intention to get his gun from his car to kill Nuzzaci. ''Lou,'' he said, ''you don't know how lucky you are.'' He told Nuzzaci of his love for Margaret and that he would ''crucify anybody that goes near her . . . stay away from there. . . . It might be you.'' He repeated his warning on the following day. Such evidence furnishes proof of the motive operating in appellant's mind two weeks previous to the 30th day of December, 1951.

Paul Beck testified that on the night of December 29th he arrived at the Symington apartment about 10:15; that after several hours of drinking with the ladies, he and Margaret retired to the bedroom. Mr. Thomas who had entered during the revelry took an early departure. The next event of which Beck had recollection was awakening in Margaret's bedroom to see appellant with a gun in hand rushing at him. Following the melee in which Beck was knocked unconscious and blood.flowed from his wounds, appellant stood at the foot of the bed beating Margaret who was screaming, ''Mert, it is murder. Mert, you are killing me. Mert, stop.'' Then he rushed at Beck repeating, ''I am going to kill you.'' He carried a gun in one hand and a knife in the other. As he thrust the knife into Beck's chest, the latter threw the bedclothes upon his assailant, leaped from the bed, ran through the kitchen and out to the street. Appellant followed and again stabbed Beck. At that moment the police arrived and Misener escaped into the darkness. The officers returned Beck to the apartment of Ann Symington who lay on a couch in the living room, her head in a pool of blood, a spent bullet nearby. She died shortly thereafter. The corpse of Margaret was in the bedroom. A yellow metal tie-chain with the initial ''M'' lay close to her. The apartment was a shambles of blood and death. Appellant's automobile with the engine still warm was found in the alley behind the premises.

After their discovery at appellant's apartment of silent evidences of his participation in the bloody orgy, the officers

traced him to Torrance where he was apprehended at about 8 a.m. He had been denied admission to the home of his friend Mr. Miller. The Millers had been informed about 5 a.m. by the police of their search for Misener. Before leaving the Miller doorstep, appellant left $2,300 in cash on the stairway, instructed Mr. Miller to send it to his wife in Maine.

During the ride from Torrance to Santa Monica with police officers, appellant was asked, ''How many times did you shoot Margaret, two or three times?'' He answered, ''I don't know whether it was two or three times.'' When asked if he ''blew his top'' when he found another fellow in bed with Margaret Cramer, he replied, ''I guess I did.'' A .25 caliber gun and holster were subsequently found at the rear of appellant's 24th Street apartment. Expert testimony established that the bullet found near Miss Symington's head, the bullet removed from the body of Margaret, and a spent bullet found in her bedroom had been fired from such gun. Also, expert witnesses testified that appellant's fingerprint was on the knife found in the sink of the women's apartment. The autopsy surgeon's report established that Ann died of a gunshot wound in the head; Margaret's death resulted from hemorrhage from numerous stab wounds and a gunshot wound on the face.

It was thus established that appellant was guilty of the dual murder and of the assault with a deadly weapon with homicidal intent. His every step leading to the crime was taken with deliberation and premeditation. Direct evidence of these essentials of murder in the first degree is not required. They may be inferred from the proof of the facts and circumstances of the crime. (*People* v. *Eggers,* 30 Cal.2d 676, 685 [185 P.2d 1].) The nature of the weapon used, the declarations of hostile malevolence toward any rival, his threats of death two weeks in advance of his vengeance and his contemporaneous declarations and savage assaults upon the woman who had rejected him serve to provide a reasonable basis for a conviction of murder in the first degree.

Shortly after Margaret had left appellant he learned that other men were visiting the women in Ann's apartment. His warnings to such visitors that he would crucify anyone that should go near Mrs. Cramer and his boast to Nuzzaci that the latter was lucky to have escaped, prove a brewing malice and a girding of his loins for combat. One hour after having seen other men with the women he returned to their apartment with a reign of terror and his threats of murder were dealt

out with gunfire and steel. He poured a bullet into Ann's brain as she slept. Margaret's body was mutilated by 86 separate wounds and a bullet through her face. Having meditated upon his rejection by her who had attended him on many an amorous adventure, the jury were warranted in believing that he had resolved to remove her from the mundane scene and to erase those who might have contributed to her alienation and who could be witnesses against him. By reason of the recited facts it was a reasonable inference that the crimes were maliciously conceived and premeditatedly executed.

### No Prejudice from Rulings

Appellant testified that on the evening of December 29, 1951, while on his way to a motion picture theatre he became ill and telephoned Margaret to request that she give him medicine to settle his stomach. At her suggestion he called at the apartment where she gave him two yellow capsules. He left immediately but had no recollection of his movements until his arrival in Torrance the next morning. During the cross-examination of Beck, appellant's counsel sought to corroborate Misener's testimony as to the telephone call to Margaret. The following occurred:

"Q. Did she receive a telephone call that night, if you know? A. Yes, she received a telephone call.

"Q. Did you hear her say when she put her hand over the mouthpiece, 'This is Mert'?"

■ Objection was made to this question as calling for hearsay and the objection was sustained. Appellant now contends that such ruling was erroneous, that this testimony would not be rendered inadmissible by the hearsay rule since it was sought only to show Margaret's belief that she was talking to Misener and it was not offered to prove the truth of the matter asserted. Appellant is in no position to complain of the ruling. The transcript reveals as does his own brief, that he offered the evidence to corroborate his own testimony that he telephoned Margaret. Yet he boldly asserts that the truth of whether or not he made the call was not the matter to be established. Obviously, if it were an attempt to prove he made the telephone call, the statement was hearsay and inadmissible. No applicable exception to the hearsay rule has been suggested.

If, on the other hand, the evidence was in fact offered merely to establish that the statement was made and to show Margaret's belief that appellant was telephoning, still it

would not follow that the statement was erroneously excluded. The fact that Margaret believed Misener was calling was of no moment in the case. Such fact was not a material issue and evidence tending to prove or disprove it would be immaterial, and hence inadmissible.

■ Through cross-examination of Beck, appellant sought to establish that after Misener left the apartment before midnight, Margaret said to Beck, ''I have gotten rid of that wet blanket. I lowered the boom on him.'' An objection on the ground that the question called for hearsay was sustained. Appellant contends that its exclusion was error; that the hearsay rule would not operate as a bar to its admission since the testimony was offered to show the declarant's state of mind—her intent to get rid of appellant by giving him sleeping tablets, thus corroborating appellant's testimony. Relied upon in support of this argument are decisions such as *People* v. *Weatherford,* 27 Cal.2d 401 [164 P.2d 753], and *People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627], in which a decedent's declarations expressing an intention to do an act in the future were held admissible as proof that the act was probably performed as intended. Conceding, *arguendo,* that the ruling was erroneous, it is not shown to have been prejudicial. In view of the guilt of appellant as disclosed by the record, it cannot be said that the exclusion of the testimony caused any detriment to him. Such testimony was of little probative value. Margaret's statement that she ''lowered the boom'' on appellant lends little, if any, support to his defense that he had been drugged. Even if material, such statement was so general in its import as to permit any number of inferences to be drawn therefrom including the very logical conclusion that Margaret peaceably persuaded appellant to depart. This could well be true since she considered him a ''wet blanket'' whose absence would tend to preserve the festive atmosphere of the apartment.

The mass of inculpatory testimony, appellant's admissions, his flight and efforts to evade his pursuers—reflecting his consciousness of guilt, all point unerringly to the ultimate fact that he was the perpetrator of the horrible crimes. To reverse the judgments for' asserted error in the court's ruling would be to scorn principles of respected lineage, violate the Constitution of this state (art. VI, § 4½) and subvert established rules of appellate procedure.

■ The court's limitation on appellant's cross-examination of Dr. Wyers, psychiatrist, during the trial of the issue

of appellant's sanity is assigned as prejudicial. He testified on direct that from his examination of Misener it was his opinion that appellant was sane during the period from midnight on December 29 to 6 or 7 a. m. on December 30, 1951. On cross-examination he testified that it could not be said that because a person had loss of memory he was insane during that period; that if a person suffered from a pathological intoxication, he would say such person was insane and that such a person "likely would not be able to" differentiate between right and wrong. The following then occurred.

"Q. Now, Doctor, isn't it true that if a person's symptoms —that is, his history is that he was under the influence of a certain drug and that he had no conscious recollections for a period of approximately six hours and from extrinsic evidence it appeared that he had done certain automatic acts, are they not the symptoms of pathological intoxication?

"Mr. Aggeler: Just a moment. I will object to that question, that it is a hypothetical question based upon a very limited set of facts that do not represent the facts in this case.

"The Court: Pathological intoxication is merely, as I understand it, a form of unconsciousness, isn't it?

"The Witness: Well, yes."

Respondent's objection was sustained. Appellant now contends that he was thereby prejudiced as he was forestalled of an opportunity to demonstrate by the doctor the probability of appellant's insanity. The ruling was correct. Appellant had previously been found guilty of murder as charged and implicit in such finding was the determination that he was conscious at the time the crimes were committed. (*People* v. *Wells,* 33 Cal.2d 330, 349 [202 P.2d 53].) Hence, the assumption that appellant's acts were "automatic" contradicted the weight of the evidence and was contrary to the jury's previous determination. Moreover, the question did not specify the drug by which it was to be assumed the hypothetical person was influenced. Accordingly, since the question was vague, uncertain and not phrased in conformity with the weight of the ev'dence, it was properly disallowed. (*People* v. *Wilson,* 25 Cal.2d 341, 348 [153 P.2d 720].)

In any event, the ruling could not be said to have prejudiced appellant. Expert testimony at the first phase of the trial, the entire record of which was stipulated as being

before the jury at the sanity proceeding, was received to show that appellant was unconscious at the time of the commission of the crimes charged. One expert also testified that Misener had a pathological intoxication at that time. ` Hence, when Dr. Wyers testified that one suffering from a true pathological intoxication was criminally insane, appellant's proof was complete and no prejudicial error could have resulted.

Judgment and order denying the motion for a new trial are affirmed.

McComb, J., and Fox, J., concurred.