[Crim. No. 6783. Second Dist., Div. Three. Mar. 9, 1960.]

THE PEOPLE, Respondent, v. GERALD BYRON FEASBY,
Appellant.

Ellery E. Cuff, Public Defender (Los Angeles), Richard S. Buckley and Richard W. Erskine, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

VALLÉE, J.—A jury found defendant guilty of murder of the first degree and fixed the penalty as imprisonment for life. The trial court denied his motion for a new trial and sentenced him accordingly.

The victim was Charlotte Trosper, sometimes called "Sharlee." Miss Trosper was 19 years old. She lived in Glendale; was 5 feet, 5 inches tall, and weighed 145 pounds. In the fall of 1958 defendant and Miss Trosper were keeping company.

About 12:30 p.m. on December 2, 1958, Rolland Erickson, a motorist, saw the body of Miss Trosper in a clump of bushes at a point down a hill from an off-ramp on Angeles Crest Highway 2.9 miles north of Foothill Boulevard. She was dead. Officers were called, and they arrived at the scene about 1:10 p.m. There was a small cut in Miss Trosper's dress in the area of the left breast and a wound in the flesh in the same area. Directly below her head, spread out fan-shape from about 2 feet to about 27 feet, the officers found various items of "feminine beauty aids"; a large black purse containing $5.00; a billfold; and about 26 feet below the head, one woman's black sandal.

The autopsy surgeon testified the cause of death was a stab wound of the heart with massive internal hemorrhage. The fatal wound entered the body at a point $1\frac{1}{8}$ inches to the left of the mid-line of the chest. The length of the wound was five-eighths of an inch. Its vertical axis was vertical with the long axis of the body. It went almost straight into the body. It was between 4 and 5 inches deep. The terminal point was in the heart; it almost came out the back surface of the heart. Death had occurred within 5 to 10 minutes.

The tissues around the left eye were swollen and discolored. There was a superficial laceration on the back of the left wrist. The fourth and fifth fingers of the left hand were bruised. These injuries were suffered before death. There was an injury to a large portion of the left scalp area from above the ear to the top of the head. It was a deep scalp "ecchymosis," a discoloration due to blood which had leaked into the tissues from broken blood vessels. This injury was suffered within a few hours before death. There was no physical injury to the brain, and the autopsy surgeon could not say whether the injury caused unconsciousness. A plastic bridge with two false

teeth was found in the front portion of the epiglottis. The bridge was designed to fit the roof of the mouth. About one-third had been cleanly broken away and was not found. No blood or flesh fragments were found in the deceased's finger-nail scrapings.

Defendant and Clifford Madrid had known each other for four and a half years and lived in the same apartment about six weeks. Defendant moved out about a week before December 1, 1958. On December 1 defendant went to Madrid's mother's house. Madrid was there. Defendant asked Madrid where he could obtain a gun for him, and offered to pay $50 for the gun and to give Madrid $10. Madrid made an unsuccessful phone call in an effort to obtain a gun.

About 2:15 a.m. on December 2 defendant, driving his car, saw Madrid walking on the street and gave him a ride to Madrid's apartment. Defendant went in with Madrid; they drank beer; and this conversation occurred: Defendant: "There is some blood on the back of your shirt." Madrid: "Oh, I wonder how it got there." Defendant: "Oh, me and Charlotte—me and Sharlee had an argument." Madrid: "Oh. Very bad?" Defendant: "Oh, probably the usual or so." Madrid: "Well, how did it get on there?" Defendant: "I hit her in the nose. Probably blood on the seat and you got it on your shirt." Madrid: "Oh?" Defendant: "I suppose you will probably kick me out of your apartment if you had known that I had—if 'Sharlee' was dead. . . . Would you be surprised if she was dead?" Madrid: "Yeah. How bad was the argument?" Defendant: "Oh, it wasn't——" Madrid: "Is she dead?" Defendant: "No." Madrid: "Are you really kidding about her being—about you killing her?" Defendant: "No, she's still alive." Madrid testified that during the conversation defendant had "a smile on his face. He wasn't nervous or anything like that"; he was "very calm."

Defendant spent the rest of the night in Madrid's apartment. They arose about 11:30 the next morning. Madrid asked defendant, "You still want the gun?" Defendant said, "No, I haven't any more use for it." As Madrid was about to leave the apartment, defendant asked, "Would it be okay if I stayed here?" Madrid said, "All right," and left. He returned to the apartment about 9 o'clock that evening. Defendant was there. This conversation occurred: Madrid: "You been here all day?" Defendant: "No, I just got in myself." Madrid: "Where you been?" Defendant: "Oh, I went to my apartment for a couple of minutes." Madrid testified defend-

ant "said that he had went by 'Sharlee's' house, and there was a police car out there. And I believe he kept going, and he came back to Pasadena." About an hour later defendant suggested they go to a bar. They left and visited several bars. In one of them defendant said, "I might as well live it up or celebrate, tonight is my last night." Madrid said, "[W]hat do you mean by that?" Defendant replied, "Oh, never mind."

When the bars closed, defendant and Madrid got into defendant's car. About 2:10 a.m. the police stopped them. Officer James told defendant he was under arrest. Defendant said, "I have been expecting you." James informed defendant the charge was suspicion of murder. Defendant said, "Yes, I killed her. We had an argument. It was self defense." Another officer looked into defendant's car. Defendant said, "What you're looking for is over there." The officer found a knife under the floor mat. Defendant said it was the knife he used to kill the girl; he had intended to throw it away, but for some reason he had left it in the car after washing the blood off the knife and off the seat of the car. A pair of trousers was found hanging in the car. A spot of blood was found on the inside of the right-hand side pocket of the trousers. It was "human blood, type O." A "rich specimen of blood" was found in the hinge area of the middle of the front seat of the car. Two pieces of the fabric showed human blood, "type O." Blood stains were found on the right front of the shirt defendant was wearing. The shirt appeared to have been washed. The stains could not be typed. The deceased's blood was "type O." The autopsy surgeon found a tiny thread-like piece of wool material, dyed black, in the left eye of the deceased. The fiber in this cloth was the same as the material in the trousers found in defendant's car.

The deceased had been employed as a receptionist in a photographer's studio operated by Emmett Hubarth. On November 28, 1958 (the day after Thanksgiving) she had a conversation with Mr. and Mrs. Hubarth in the latter's home (later referred to as the first conversation). Mr. Hubarth testified: the deceased asked Mrs. Hubarth "[H]ow she could meet a fellow"; Mrs. Hubarth told her she thought she and defendant were married; the deceased said no, "she liked Jerry [defendant], but she didn't love him because of the fact he wanted her to" commit the act denounced by section 288a of the Penal Code "all the time"; [m]y wife asked her why she did it if she didn't want to; and she said she was in fear

of Jerry and she had just got that way. She didn't tell us the reason why. But she had never been afraid of him up until that point. She said she had liked him up until Thanksgiving.''

On November 29, 1958, Mr. Hubarth had a conversation with the deceased at his place of business in Los Angeles (later referred to as the second conversation). Mr. Hubarth testified he looked at the deceased as she came through the door and asked her what had happened, ''she was messed up a little bit.'' The deceased said they ''were up in the hills last night, and Jerry had roughed her up''; that ''Jerry wanted her to call him mister and treat him as if he was God''; that ''she was very, very afraid of Jerry and he had threatened to shoot her''; that they had been stopped by the police three times up in the hills. Mr. Hubarth said, ''Well, why didn't you tell the police then?'' The deceased ''said she thought at the time Jerry wasn't serious about what he was talking about, and she didn't want to get him into trouble.''

About 5:30 p.m. on December 1, 1958, the deceased telephoned Mr. Hubarth at his home in Los Angeles (later referred to as the third conversation). She wanted to know if he wanted her to come to work. He told her it was up to her; he could get along without her that night. She ''more or less insisted she wanted to come,'' and said she would come. Mr. Hubarth asked her how she was coming, and if she wanted him to pick her up. She said, ''No, Jerry is here,'' he is going to take me to Sears first. Mr. Hubarth did not see her alive after that conversation.

Defendant did not testify. Officer McVeigh of the Glendale Police Department testified in his behalf that about 11:20 p.m. on November 18, 1958, he went to the apartment of deceased in Glendale; defendant and the deceased were there; she was crying; defendant was ordered to leave, which he did; defendant returned to the door of the apartment; the deceased turned in that direction, saw defendant, turned, picked up a tea kettle and threw it at defendant; it missed by three or four feet; she was about 10 feet from defendant when she threw it; she turned toward the sink, on which there were two knives; she did not pick up a knife; she then became hysterical and crumpled to the floor, crying; defendant had a dental bridge in his pocket; it was broken in two parts; the part that fits into the mouth was broken off; Miss Trosper had two upper front teeth missing. No other evidence was offered in behalf of defendant.

The first point urged is that the evidence is insufficient to sustain the finding of murder of the first degree. It is conceded the evidence sustains a finding of murder of the second degree. The argument is that there was no evidence to sustain a finding that the killing occurred in the commission of, or attempt to commit, one of the felonies enumerated in Penal Code, section 189;[1] there was no evidence to sustain an implied finding that the killing was wilful, deliberate, and premeditated; and the evidence merely shows an unlawful killing by defendant.

Section 187 of the Penal Code defines murder as the unlawful killing of a human being with malice aforethought, and section 189 provides, in part, that all murder perpetrated by any kind of wilful, deliberate, and premeditated killing is murder of the first degree. ■ " 'Deliberation means careful consideration and examination of the reasons for and against a choice or measure. ■ The verb "premeditate" means to think on and revolve in the mind beforehand; to contrive and design previously.' " (*People* v. *Honeycutt*, 29 Cal.2d 52, 61 [172 P.2d 698].) ■ "It is 'the exclusive province of the jury to determine from the evidence whether the killing was the "wilful, deliberate and premeditated" act of defendant.' [Citation.] However, 'as is true as to all factual issues resolved by a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict.' [Citation.] ■ This court may not, in reviewing the evidence, substitute its judgment for that of the jury, and, where there is substantial evidence in support of the jury's verdict, its determination must be upheld. [Citations.] ■ Conversely, to justify the reversal of a judgment of conviction, the record must clearly show that the evidence could not be interpreted as supporting the verdict. . . . ■ [E]xpress evidence of a deliberate and premeditated purpose to take life need not be shown. Deliberation, premeditation and wilfulness may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such a conclusion." (*People* v. *Eggers*, 30 Cal.2d 676, 685-686 [185 P.2d 1]; *People* v. *Cole*, 47 Cal.2d 99, 106 [301 P.2d 854, 56 A.L.R.2d 1435].) ■ It is not

[1]Section 189: ''All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree.''

for this court to weigh the probabilities. Our only function is to determine whether there is evidence which leads to the conclusion of guilt of first degree murder without doing violence to reason and logic. (*People* v. *McAuliffe*, 154 Cal.App. 2d 332, 339 [316 P.2d 381].)

The presence of premeditation or the absence thereof is to be determined from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the deceased; the fact that the attack was unprovoked and that the deceased was unarmed at the time of the assault; the conduct of defendant in disposing of the body, his conduct thereafter, and any other evidence from which an inference of premeditation may reasonably be drawn. (*People* v. *Cook*, 15 Cal.2d 507, 516 [102 P.2d 752].) The law does not require that the thought of killing be pondered for any specific length of time in order that the killing be considered deliberate and premeditated. (*People* v. *Morris*, 174 Cal.App.2d 193, 196 [344 P.2d 333].)

Defendant attempted to procure a gun the day before he killed Miss Trosper; offered to pay $50 for one; and to give Madrid $10 for getting one for him, without stating the purpose for which he wanted the gun. After the killing he told Madrid he no longer needed one. Since defendant admitted the killing, the jury could have inferred he wanted the gun with which to kill Miss Trosper, and that at that time he was planning her death.

The knife defendant used to kill was 13 inches long. It had a blade 8¼ inches long and ¾ of an inch wide. The handle was 4¾ inches long. The knife went into the body between 4 and 5 inches. Defendant did not slash wildly or without aim, as in a struggle. The jury could infer from the evidence that defendant aimed the knife directly at the heart. It took considerable deliberateness and premeditation to strike in the heart and force the knife nearly through the heart in almost a straight line. Defendant's coordination at that time and all the circumstances demonstrate a choice and a plan of conduct which are inconsistent with a conclusion that he did not premeditate. As the autopsy surgeon testified, neither the blade nor the point of the knife was particularly sharp; the knife went "through fairly dense cartilage in the rib cage" and it took "a fairly significant degree of force and direction to have caused this knife to penetrate in the fashion that it did."

From the evidence it could be inferred the killing took place in defendant's car. There was blood in the car. The absence of material under the fingernails of the deceased negatives an extended struggle. The area in which the body was found did not indicate a struggle there. The deceased suffered a severe head injury, a black eye, and other bruises. The fiber in her eye matched the fiber in the trousers found in defendant's car. It may be inferred that the body was carried in the car to the point where defendant disposed of it. He wiped the blood from the knife and from the seat of his car. He washed his shirt in an effort to remove blood stains.

Defendant disposed of the body by throwing it from the highway down a hill into rather thick and heavy brush in an isolated area. After the killing he smiled and joked about it to his friend, Madrid. He intended to dispose of the knife but for some reason hid it under the floor mat of his car.

Defendant had it in his power to explain all the circumstances of the killing. He did not. " '[T]he failure of the defendant to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable.' " (*People* v. *Goldstein*, 139 Cal.App. 2d 146, 155 [293 P.2d 495].)

The evidence is sufficient to support the jury's finding that defendant was possessed of a wilful, deliberate, and premeditated intent to kill. (*People* v. *Guldbrandsen*, 35 Cal.2d 514 [218 P.2d 977] ; *People* v. *Morris*, 174 Cal.App.2d 193 [344 P.2d 333] ; *People* v. *Keeling*, 152 Cal.App.2d 4 [312 P.2d 407] ; *People* v. *Misener*, 115 Cal.App.2d 63 [251 P.2d 683] ; *People* v. *Bjornsen*, 79 Cal.App.2d 519 [180 P.2d 443].)

In his brief defendant challenged the rulings made, over his objection, admitting the second and third conversations testified to by Mr. Hubarth in evidence. At the argument, his counsel commendably conceded that under *People* v. *Merkouris*, 52 Cal.2d 672 [344 P.2d 1],[2] the rulings were correct. He insists, however, it was prejudicial error to admit the first conversation over his objection. The conversation was offered to show the state of mind of the deceased, that she feared defendant and wanted to break up with him, and not to show the truth of the statements. Defendant objected on the grounds

[2]Merkouris was decided after counsel for defendant had prepared his brief.

the testimony was hearsay, of remote probative value, and highly prejudicial. The objection was overruled. Before the evidence was received, the court instructed the jury that the testimony about to be elicited ''is given for the purpose of determining the frame of mind of the deceased in relation to her attitude toward the defendant,'' ''just to show her state of mind,'' ''and not for the truth of what may be stated.'' Counsel argues that the testimony inevitably had the effect of placing defendant in a most unfavorable light before the jury; that the fear expressed is hearsay; and that the remainder of the testimony tends to show not only an illegal sexual relation but one that could so prejudice jurors that they could not fairly judge defendant's case; and that the implication in the statement that defendant forced this type of sexual relation would tend to strengthen any prejudice aroused.

A person's mental state of fear is provable by his declarations. (*Hatzakorzian* v. *Rucker-Fuller Desk Co.*, 197 Cal. 82, 102 [239 P. 709, 41 A.L.R. 1027].) In *People* v. *Merkouris, supra,* 52 Cal.2d 672, the defendant was found guilty of having murdered Despine Forbes and Robert Forbes. On appeal the defendant complained of the testimony of Mr. and Mrs. Fairly and Officer Bonk which ''was to the effect that in August 1948 Despine and Robert Forbes expressed to Mr. and Mrs. Fairly their intent to stay with them awhile because defendant had threatened their lives, and that in 1949 or 1950 Robert Forbes expressed to Officer Bonk his intention to obtain a permit to carry a gun because defendant had been bothering the Forbeses again.'' These declarations had been made four to five years prior to the time the offenses were alleged to have been committed. The testimony was objected to on the ground it was immaterial, hearsay, remote, and prejudicial. The objection was overruled. In doing so, ''the judge admonished the jury that the evidence was being received for the limited purpose of showing the declaration of intent of the deceased persons and their state of mind and not as to the truth of the statements alleged to have been made.'' Holding the rulings were correct, the court, speaking through Mr. Justice McComb, stated (p. 682):

''The victims' assertions of intent to avoid and protect themselves from defendant were admissible under the mental state exception to the hearsay rule as evidence that in fact they had such intent. The existence of that intent evidences the declarants' fear of defendant.

''The declarations that defendant had threatened

the victims were admissible, not to prove the truth of that fact directly, but to prove the victims' fear.

"Where, as here, the identification of defendant as the killer is in issue, the fact that the victims feared defendant is relevant because it is some evidence that they had reason to fear him, that is, that there is a probability that the fear had been aroused by the victims' knowledge of the conduct of defendant indicating his intent to harm them rather than, e.g., that the victims' fear was paranoid. (*Karnes* v. *Commonwealth*, 125 Va. 758 [99 S.E. 562, 564 [4] et seq., 4 A.L.R. 1509]; *Lowrey* v. *State*, 87 Okla. Crim. 313 [197 P.2d 637, 651 [14, 15]]; *State* v. *Bauers*, 25 Wn.2d 825 [172 P.2d 279, 286-287 [8]-[9]].)"

"Appellant being charged with murder and the evidence against him being circumstantial in its nature, the state of mind of Zona Bauers [the victim] at or not long before the time of her death, with particular reference to whether or not she was in fear of appellant, was significant and relevant. Under a well recognized exception to the hearsay rule, her state of mind could have been shown by evidence of statements of Zona Bauers indicating her mental attitude. The rule is stated in 1 Wharton's Criminal Evidence, 11th Ed., 365, section 285, as follows: 'Declarations of deceased, about the time of the homicide and so connected with it as to form a part of the transaction or to explain it, are relevant on the prosecution of the homicide charged. . . .'" (*State* v. *Bauers*, 25 Wn.2d 825 [172 P.2d 279, 286-287]. Also see *White* v. *State*, 52 Nev. 235 [285 P. 503, 509]; *State* v. *Lang*, 108 N.J.L. 98 [154 A. 864, 866].)

"Declarations of the victim before the homicidal act are admissible where they were so connected therewith as to form a part of the same transaction and illustrate and explain the killing. . . . Where deceased's intention is material, his declarations as to his intentions are relevant, and his declarations are likewise admissible to explain his conduct and motive where such is relevant. A declaration by deceased indicating a present intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, has been held to be admissible to prove that the act was in fact performed, and to explain deceased's conduct." (40 C.J.S. 1180-1181, § 243.)

We are of the opinion that application of these authorities compels a holding that the first conversation was admissible in its entirety to prove the intention of the deceased

and her fear of defendant. The question of deliberation and premeditation was in issue. The statement of the deceased indicated an intent to sever her relation with defendant and her fear of him. The next day ''she was messed up.'' The jury could have inferred she had told defendant of her intention and that she had attempted to sever the relation. The jury could have inferred from the fact the deceased intended to sever her relation with defendant and that ''she was messed up'' that she had resisted advances on his part and provoked his anger. From the other evidence the jury could have concluded reasonably that thereafter he formed the intent to kill her, thus negativing the assertion of defendant to the police that he had killed in self-defense.

 The fact that the statements of the deceased involved another crime by defendant is in itself no objection. If evidence in a criminal case tends logically, naturally, and by reasonable inference to establish any fact material for the People, or to overcome any material matter sought to be proved by the defense, it is admissible whether it embraces the commission of another crime or not. (*People* v. *Coefield,* 37 Cal.2d 865, 869 [236 P.2d 570].) ''The rule is well settled that if evidence is admissible for any purpose it must be received, even though it may be highly improper for another purpose.'' (*Daggett* v. *Atchison, T. & S. F. Ry. Co.,* 48 Cal.2d 655, 665 [313 P.2d 557].)

No other points are made.

The judgment and order denying a new trial are affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1960.