[Crim. No. 8429. Second Dist., Div. Three. June 17, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES FRANKLIN LEWIS, Defendant and Appellant.

Dion G. Morrow, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and N. Gregory Taylor, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—A jury found the defendant guilty of murder of the first degree and determined that the penalty should be imprisonment for life. The trial court denied the defendant's motion for a new trial and sentenced him in accordance with the determination of the jury. The appeal is from the judgment and from the order denying the motion for a new trial.[1]

The victim was Vivian Marie Musgrave. She lived alone in one of two apartments which were above garages in the rear of premises on which was located an apartment house. In the other apartment two sisters, Mrs. Beck and Mrs. McRae, resided. Mrs. Beck saw Mrs. Musgrave about 5:30 p.m. on December 13, 1961. At about 7 p.m. she knocked on Mrs. Musgrave's door but received no response. When Mrs. Beck went for a walk along the porch in front of the two apartments about 10 p.m., she saw spots which led from Mrs. Musgrave's apartment. A neighbor, Mr. Flynn, was called and he discovered Mrs. Musgrave's body on the floor of her apartment.

A police officer for the City of Huntington Park arrived shortly after 10 p.m. The body was in the kitchen. The officer found spots of blood in that area. There was a pool of blood by the body. He saw what appeared to be blood spots on the outside steps of the building and on the upper landing. A pair of broken glasses was near Mrs. Musgrave's head but, other than that, there was no indication that a struggle had taken place.

Mrs. McRae and her sister were watching television that evening from 7 to 10 p.m. About 8:30 p.m. Mrs. McRae thought she heard Mrs. Musgrave's screen door "click," but she heard no other noise above the sound of television during that evening.

Dr. Moore, the physician and pathologist who performed an autopsy on the body, expressed the opinion that the cause of death was multiple stab wounds of the neck, chest and upper extremities. There were 47 wounds. With respect to those of such a nature as to be immediately fatal, the witness stated that "there were two that penetrated directly into the heart, one into the upper chamber of the right side of the heart and one into the lower chamber of the right side of the heart."

[1] Since the amendment in 1961 of section 1237 of the Penal Code, a denial of a motion for a new trial is not an appealable order. Accordingly, the appeal from such an order in the present case must be dismissed.

He further testified as follows: "The examination of the wounds individually and under a magnifying glass indicated that the wounds had what is known as sharp angles, that is, the angles cut almost at a very sharp point from the skin and subcutaneous tissue and only a few of them had a slight tear near the outer portion indicating that perhaps there had been some rotation or jagging of whatever weapon was used, but from examination of these wounds it was most suggestive that these were caused by a cutting instrument, that is, an instrument with cutting edges."

Dr. Moore expressed the opinion that the instrument used was "an intermediate size between a large pocket knife and a, well, common kitchen knife by example." The basis for his opinion was stated as follows: ". . . because of the degree of penetration of some of those wounds that entered from the skin through the thickness of the breast tissue and into the thorax, still penetrating the lung and into the heart, which gives a distance of—it may vary anywhere from four to six inches. Probably larger—I mean deeper." When asked if he meant that there was actual penetration to that extent, he answered: "Well, it varies. It depends entirely upon the location. At some areas there's much more skin and fat so therefore, it increases the thickness of the tissues that the weapon has to go through, and others the wound was immediately below a portion where the bone was very superficial such as in the chest plate and others it was almost through the entire thickness of the breast, so that there is no actual way to determine. It wasn't a uniform penetration throughout all the wounds. Even their size varied within very short range. Most of them were five-eighths of an inch by one inch—by one-eighth of an inch; one-half by one-eighth, one-half by three-sixteenths of an inch and so on, but they varied even in their size as far as their length, as far as their measurements across and as far as their depth, each one of them, but all of them had the gross appearance that the wounds were produced by an instrument with cutting edges or a cutting instrument." The witness further stated that one of the wounds penetrated what is commonly known as the voice box and that the injury would render the person unable to cry out. All of the wounds were inflicted within a short span of time.

The former wife of the defendant testified that he came to her home about 3:30 p.m. on December 13, 1961, and left at

approximately 5:30 p.m. Mrs. Meredith Hendrix, a second cousin of the defendant, testified that she retired at about 8:30 p.m. on December 13, 1961. Sometime thereafter the defendant came to her residence. He had a bloody towel wrapped around his hand and said that he had hurt his hand while helping a woman who was having trouble with her automobile. The defendant washed his hand, leaving the bloody towel in the bathroom. Mrs. Hendrix bandaged the hand. After the defendant had rested on a divan for a short time, he left the house. Approximately an hour later detectives came to the house of Mrs. Hendrix. Sergeant Human removed the bloody towel from the bathroom and took it with him.

Detective Sergeant Fern of the sheriff's department went to the defendant's residence about 1 a.m. on December 14, 1961. The defendant arrived there six or seven minutes later. The defendant had ''a rather severe laceration on the inside of his small finger on his right hand, and another laceration not so bad, on the ring finger on the inside of his right hand.'' The hand was bloody but the officer could not be certain that it was still bleeding.

Deputy Sheriff Human arrived at the defendant's residence at 1:30 a.m. on December 14, 1961. He observed what appeared to be spots on the defendant's shoes. He requested the defendant to remove the shoes and took possession of them, subsequently turning them over to Clifford Cromp of the sheriff's department. At another time he took possession of the defendant's khaki shirt. The defendant said that he had injured his hand while repairing an automobile for a woman. At the sheriff's station the defendant said that he knew Vivian Musgrave and had been going with her for a period of approximately two and a half years. He further stated that to the best of his recollection he had last seen her on the preceding Monday morning, December 11, in the office where he was employed, when he left work at approximately 9 a.m. His last date with her had been, as he recalled, on the night of November 21. When asked if he had made any future engagements with her, he replied that he had a date for the next Saturday. The defendant said that he and Mrs. Musgrave had had no serious arguments. On his last date on November 21, Vivian Musgrave had informed him that she was going back to the church and she did not feel that their relationship should continue as it had. Upon further inquiry, the defendant said that he did not resent her statement. The defendant had not worked since Monday

of that week, he stated, and on December 13 had visited his former wife and then had gone to his physician's office. Thereafter, he went back to his former wife's home, where he stayed for a few minutes and then went home. After that, he left for the purpose of going to a grocery store, and on the way, while he was stopped for a traffic signal, a woman asked him to assist her with her disabled car. She gave him a knife which she had obtained from the trunk of her car. In using the knife to strip the insulation from a wire, he cut his hand. He wrapped an old T-shirt around the hand. After the automobile was again in running condition, the woman and the defendant went for a ride in his car, the woman doing the driving because his hand was bleeding. He further said that after they returned to the place where the woman's automobile was parked, he went to the home of Mrs. Hendrix. He believed that he arrived there at approximately 7 p.m. and remained until 1 a.m. At a later point in the conversation, the defendant said that the time of his arrival might have been later than 7 p.m. With respect to the towel stained with blood, the defendant said that Vivian Musgrave had given it to him several weeks before for his use when he was fishing. He also said that he had been in Vivian Musgrave's apartment numerous times and had taken her to and from work. When asked whether he knew the type of his blood, the defendant replied that it was O. As to the blood on his shoes, he stated, in substance, that it came from his hand.

Clifford C. Cromp, a forensic chemist employed in the sheriff's department, testified that he had made an analysis of a sample of Mrs. Musgrave's blood. In his opinion, it was type A. With respect to a spot on a fiber mat and the spots just outside the Musgrave apartment and on the stairway leading thereto, he testified that he removed portions of the stains and made an analysis thereof. In his opinion, the material in each instance was type O human blood.

Mr. Cromp also examined spots inside the apartment and made a chemical analysis of samples of stains taken therefrom. In his opinion, all of the stains which he removed were composed of dried human blood. As to the type thereof, Mr. Cromp testified as follows: "In my opinion the blood stain which I removed from the kitchen cabinet, the one from the refrigerator and the one from the kitchen floor close to the kitchen table were all Type A human blood. The spot which I removed from the surface of the kitchen table itself, the

spot on the hardwood floor and on the door sill leading from the apartment were Type O human blood. The stains which T found on the kitchen towel, or small tablecloth, on the kitchen chair, in my opinion the ones which I examined were Type A human blood.''

Mr. Cromp made an analysis of a stain ''on the right center of the front seat'' of the defendant's automobile. In his opinion, the stain was caused by type O human blood. With respect to his examination of the defendant's shoes, Mr. Cromp testified as follows: ''I found on the upper portion of both shoes fairly large spots of reddish brown material, on the toe area; smaller spattered reddish brown material around the heel and on the portion of the sole between the heel and the walking portion of the sole, and in addition I found what appeared to me to be a light film of reddish brown material around the edges of the heel of both shoes. . . . In my opinion the stains, the largest or most concentrated stains on the toe of the right shoe were composed of dried human blood type A. The stains on the toe and the upper portion of the left shoe were composed of dried blood type O.'' In his opinion, the stains ''on the protective portion of the sole between the heel and the walking portion of the sole on each of the shoes'' were human blood, but he was unable to determine the type.

Mr. Cromp made an examination of the towel which the defendant had wrapped around his hand. In his opinion, ''the towel was saturated with wet human blood type O.'' He had compared that towel with some towels which Captain Jacobson of the Huntington Park Police Department testified he had taken from a drawer in the kitchen of the Musgrave apartment early in the morning of December 14, 1961. All of the towels were made of linen and were of the same major dimensions. Each had a red and blue stripe ''running down each long edge of the towel and a colorful design apparently painted by some process on one end of the towel.'' Each towel was woven in a similar manner.

Mr. Cromp examined stains on the shirt taken from the defendant. He testified that the ''stains were all very small and appeared to be the result of a spattering effect rather than a seepage or direct flow.'' While the stains were caused by human blood, he was unable to determine the type thereof.

On cross-examination Mr. Cromp testified that in order of

common occurrence in this country, blood of type O was first and that of type A was second.

Two witnesses called by the prosecution testified as to declarations made by Mrs. Musgrave. On this appeal the defendant contends that the admission of such evidence constituted prejudicial error. That contention will be hereinafter discussed. One of the witnesses was Officer Davis of the Huntington Park Police Department. Over the objection of the defendant that the evidence was incompetent, he testified as to a conversation which he had with Mrs. Musgrave on the evening of October 4, 1961. His testimony was in part as follows: "A. I was detailed to Mrs. Musgrave's residence in regard to a brick having been thrown through the front window of her apartment. When I was questioning Mrs. Musgrave relating to the incident I asked Mrs. Musgrave if she had any suspects, or anyone in mind that could have possibly been the fault or behind the occurrence, and when she thought back she said the only one she could possibly have thought of was Mr. Lewis as they had a falling out the previous day. Q. Did she say anything else at that time about Mr. Lewis? A. Well, she had been receiving phone calls for approximately three hours prior to the occurrence, and she stated Mr. Lewis had her phone number which was unlisted, and her place of employment had it, and those two were the only two that she ever had conversations with over the telephone, and that approximately 45 minutes prior to the brick being thrown through her window, the last telephone call had come to her . . . well, she stated during the interrogation that Mr. Lewis had a bad temper, and she was a little bit afraid of him. . . . No, there was no further mention made of Mr. Lewis. She stated, however, that she wished the Malicious Mischief Report made, to protect her landlord for insurance purposes." On cross-examination, Officer Davis testified that Mrs. Musgrave had said that she had not answered the telephone but had let it ring; consequently, she did not know who was making the calls. The only reason she had for thinking that it was Mr. Lewis was because he had her telephone number. She further said that she did not know who threw the brick; she saw no one and she was not "absolutely certain." She did not tell the officer that Mr. Lewis had at any time threatened to do her bodily harm.

Upon the completion of the direct examination of Officer Davis, the court instructed the jury as follows: "Ladies and gentlemen of the jury, this witness has testified to certain

conversations, certain matters that occurred in October preceding the event that is the subject of this trial. At this time I want to caution you and admonish you and warn you that these statements are not being received in evidence for the purpose of establishing the truth of what they relate at all. They are being received solely and for the limited purpose of indicating a state of mind of the victim. They are not to be accepted by you as establishing the truth of the facts related in the statement."

The second witness who testified as to declarations of Mrs. Musgrave, over the objection that the evidence was incompetent, was Mrs. Sarah Feldman. On the day on which a brick went through the window of Mrs. Musgrave's apartment, Mrs. Musgrave called her on the telephone and she went to the Musgrave apartment. Mrs. Musgrave was trembling and crying. The witness asked her what had happened and Mrs. Musgrave replied, "Charles tried to kill me." The witness further testified as follows: "And she told me the police had been there and prior to my coming up Charles had called her, after the police had left, and she related the conversation she had with him on the phone, and she says, 'My life is in danger. He wants to kill me.' . . . Then she started crying again, and she said, 'He wants to kill me, my life is in danger.' Then she went on that she thought he would hurt her, but she never had any idea he would want to kill her, and that this brick coming through her window made it definite that he did. . . . Well, the reason she presumed he had thrown the brick was because she was trying to break up with him and she hadn't answered the phone all evening. . . . this was her presumption because she had not answered the phone. He had tried to contact her all evening, and she didn't answer."

On cross-examination, Mrs. Feldman said that Mrs. Musgrave did not state that Mr. Lewis had threatened to do her bodily injury. She also testified that Mrs. Musgrave did not say that she had talked on the telephone to Mr. Lewis before the brick was thrown. Mrs. Musgrave did not see the person who threw the brick.

After Mrs. Feldman had testified on direct examination as to her conversation with Mrs. Musgrave, the court instructed the jury as follows: "Ladies and gentlemen of the jury, concerning the matters to which Mrs. Feldman, the witness on the stand, testified to with reference to certain conversations she had with Vivian Marie Musgrave, the victim of this homi-

cide, on the date that the window was broken, I must caution you and admonish you not to accept any of those statements as evidence of the truth of the statements themselves. They have been received solely for the purpose of indicating a state of mind of the victim.''

Mrs. Feldman also testified that she had seen the defendant at Mrs. Musgrave's apartment. She did not recall the last time, but she stated that she had seen him ''all through the years.'' She thought that after October 4 she saw the defendant on only one occasion.

The defendant was the only witness who testified on his behalf. He and Mrs. Musgrave had been employed in the same place. He had known her for approximately four years prior to December 13, 1961. Between them there had been ''a relationship of boy friend and girl friend'' for a period of about two and a half years. It was his habit to see her often during that time. Each went to the apartment of the other. On Monday, December 11, 1961, the defendant stayed at work one hour and left at 9 a.m. because he was under the care of a physician for ''high blood pressure.'' He had been unable to sleep and had lost his appetite for several weeks prior to that. On that morning he was fatigued. As he left the office, he waved to Mrs. Musgrave and said, ''I will see you later.'' He believed that she replied ''Okay.'' They had plans for a date on the following Saturday. He had also thought that possibly they would run into each other at an office Christmas party on the following Friday.

The defendant testified that he did not go to work on Tuesday and Wednesday, December 12 and 13. On Wednesday afternoon about 4 o'clock he left his apartment and went to the home of his former wife. From there he went to his physician's office. He then returned to his former wife's house. About 5:30 p.m. he went home where he stayed for 30 or 40 minutes. He left his apartment to go to a grocery store and on the way, while he was waiting at a signal, a woman asked him to assist her with her disabled automobile. While he was stripping the insulation from a wire with a knife that the woman had given him, he cut the little finger of his right hand. He took a T-shirt and a towel out of the trunk of his automobile, wrapped the T-shirt around his finger, and put the towel on the seat of the car. Vivian Musgrave had given him the towel several weeks before. After the woman's car was in running condition again, the defend-

ant and the woman went for a ride in his automobile. When he and his companion returned to where her car was, he then went to the home of Mrs. Hendrix to see if he could get treatment for his finger, arriving there at approximately 9 p.m. He left the Hendrix residence about 1 a.m. and went home, stopping at a liquor store on the way to buy a quart of beer, cigarettes, and a package of Band-Aids. The officers were at his place of residence when he arrived.

The defendant testified that he did not see Vivian Musgrave on December 13, 1961, and that he did not kill her. He was not in her apartment on that date. He did not throw a brick through her window about October 4, had never had any "violent" arguments with her, and had never threatened her life. He never struck her or threatened her with a weapon.

The defendant further testified as follows: "Q. Had there been any conversation between you and Mrs. Musgrave around the first of December about the possibility of your terminating your relationship? A. Yes, sir. . . . She had—she wanted to go back to the church, her faith . . . She thought she would be happier in the church than to go on with our relationship. Q. And she felt she shouldn't go on with your relationship if she did become active in the church, is that right? A. That's right. Q. What was your feeling about it? A. I went along with her on that because—it didn't hurt me in any way because I knew she was unhappy about not being in the church. Q. In other words, you didn't resent it, is that correct? A. No, I didn't. Q. And no arguments came from that? A. No, sir."

In the course of the cross-examination the defendant said that his blood was type O. He also testified that after the conversation about terminating their relationship which occurred two days after Thanksgiving, he saw Mrs. Musgrave at work each day and on Saturday, December 9. On the occasion last mentioned she agreed to go out with him on the following Saturday "for dinner only." On redirect examination, part of the defendant's testimony was that after the conversation in which Mrs. Musgrave spoke of going back to the church, the understanding was that they were "going to see each other once in awhile just for dinner dates." He further testified as follows: "Q. And was that the sexual part of your relationship you were going to terminate? A. Yes."

In the present case the identity of the person who had slain Mrs. Musgrave was in issue. Consequently, the

rulings of the court as to the admissibility of the declarations of Mrs. Musgrave, to which Officer Davis and Mrs. Feldman testified, are supported by the reasoning of the opinion of the majority of the Supreme Court in *People* v. *Merkouris*, 52 Cal.2d 672 [344 P.2d 1]. It was therein said (pp. 682-683) : ''The trial court's rulings were correct. The victims' assertions of intent to avoid and protect themselves from defendant were admissible under the mental state exception to the hearsay rule as evidence that in fact they had such intent. The existence of that intent evidences the declarants' fear of defendant.

''The declarations that defendant had threatened the victims were admissible, not to prove the truth of that fact directly, but to prove the victims' fear.

''Where, as here, the identification of defendant as the killer is in issue, the fact that the victims feared defendant is relevant because it is some evidence that they had reason to fear him, that is, that there is a probability that the fear had been aroused by the victims' knowledge of the conduct of defendant indicating his intent to harm them rather than, e.g., that the victims' fear was paranoid. (*Karnes* v. *Commonwealth*, 125 Va. 758 [99 S.E. 562, 564 [4] et seq., 4 A.L.R. 1509] ; *Lowery* v. *State*, 87 Okla. Crim. 313 [197 P.2d 637, 651 [14; 15]] ; *State* v. *Bauers*, 25 Wn.2d 825 [172 P.2d 279, 286-287 [8-9]].) (See also *People* v. *Feasby*, 178 Cal.App.2d 723, 733-735 [3 Cal.Rptr. 230] ; *People* v. *Purvis*, 56 Cal.2d 93, 98 [13 Cal.Rptr. 801, 362 P.2d 713].) While a persuasive argument can be made that declarations of the nature herein involved should be inadmissible, this court is not free to depart from the reasoning of the Supreme Court in the *Merkouris* case.

 The defendant asserts that the trial court committed prejudicial error in failing to instruct the jury adequately as to the limited purpose for which the jury could consider the evidence of Mrs. Musgrave's declarations. Part of his position is stated to be that the jury should have been told that such evidence could not be considered with respect to the issue of the degree of the offense charged.[2] Upon the

[2]Cf. *People* v. *Feasby*, *supra*, 178 Cal.App.2d 723, in which it was said at pages 734-735: ''We are of the opinion that application of these authorities compels a holding that the first conversation was admissible in its entirety to prove the intention of the deceased and her fear of defendant. The question of deliberation and premeditation was in issue. The statement of the deceased indicated an intent to sever her

present record the contention is untenable. The trial court indicated to counsel that its rulings as to the admissibility of the evidence were based on the fact that the matter of the identity of the person who committed the homicide was in issue. The oral instructions which the court gave to the jury in the course of the testimony of Officer Davis and Mrs. Feldman have been noted hereinabove. Counsel for the defendant never made a request that additional instructions be given to the jury with respect to the subject of the limited use which could be made of the evidence and, consequently, the defendant is not in a position to make a claim of error. (See *People* v. *White,* 50 Cal.2d 428, 430 [325 P.2d 985] ; *People* v. *McNear,* 190 Cal.App.2d 541, 547 [12 Cal.Rptr. 124] ; *People* v. *Player,* 161 Cal.App.2d 360, 361 [327 P.2d 83].)

The defendant contends that the evidence was not sufficient to establish that he was the person who caused Mrs. Musgrave's death. The law applicable to appellate review of a case based on circumstantial evidence as to the identity of the perpetrator of a homicide was stated in *People* v. *Huizenga,* 34 Cal.2d 669 [213 P.2d 710]. After setting forth instructions given to the jury with respect to circumstantial evidence, the court stated (34 Cal.2d at pp. 675-676) : ''Guided by these instructions, the jury found defendant guilty of murder in the first degree. Defendant contends that the evidence is insufficient to justify the conviction on the ground that it fails to meet the requirement (embodied in the first paragraph of the instruction quoted above) that '[r]esting its case upon circumstantial evidence, the prosecution must not only show a set of circumstances consistent with guilt, but must show a set of circumstances inconsistent with any reasonable theory of innocence.' . . . This contention confuses the function of court and jury by implying that if the court itself can formulate a reasonable theory of innocence from the evidence it must reverse a judgment of conviction. It is not for the court, however, to determine whether it can formulate such a theory. It must assume in favor of the verdict

relation with defendant and her fear of him. The next day 'she was messed up.' The jury could have inferred she had told defendant of her intention and that she had attempted to sever the relation. The jury could have inferred from the fact the deceased intended to sever her relation with defendant and that 'she was messed up' that she had resisted advances on his part and provoked his anger. From the other evidence the jury could have concluded reasonably that thereafter he formed the intent to kill her, thus negativing the assertion of defendant to the police that he had killed in self-defense.''

the existence of every fact that the jury could reasonably deduce from the evidence and then determine whether or not a reasonable jury could find the defendant guilty beyond a reasonable doubt. 'If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.' (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) Thus, 'the rule that the circumstances relied upon by the prosecution must be consistent with guilt and inconsistent with an hypothesis of innocence is a rule of instruction for the jury, and is not the rule for the guidance of the court on review.' (*People* v. *Newland, supra,* at page 682.) ''

The evidence which supports the verdict of the jury has been set forth hereinabove. In the light thereof the jury could reasonably have been satisfied beyond a reasonable doubt that the defendant killed Mrs. Musgrave.

The final contention of the defendant is that, even if it be assumed that the defendant killed Mrs. Musgrave, there was not a sufficient basis for the determination that the offense was murder of the first degree. ''However, direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances in the case as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the jury for determination.'' (*People* v. *Isby,* 30 Cal.2d 879, 888 [186 P.2d 405].)

In *People* v. *Feasby, supra,* 178 Cal.App.2d 723, at page 731, this court said: ''The presence of premeditation or the absence thereof is to be determined from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the deceased; the fact that the attack was unprovoked and that the deceased was unarmed at the time of the assault; . . . and any other evidence from which an inference of premeditation may reasonably be drawn. (*People* v. *Cook,* 15 Cal.2d 507, 516 [102 P.2d 752].) The law does not require that the thought of killing be pondered for any specific length of time in order that the killing be considered deliberate and premeditated. (*People* v. *Morris,* 174 Cal.App.2d 193, 196 [344 P.2d 333].) ''

In the present case, the evidence sustained an infer-

ence that the defendant had a motive for seeking vengeance in that Mrs. Musgrave had informed him of her firm decision to terminate their intimate relationship. The evidence justified the inference that there had been no struggle. The assault was vicious. There was no reason for believing that it was provoked. Forty-seven wounds were inflicted by a sharp instrument, some of the wounds being of a nature sufficient to cause death without delay. Here much more was established than the isolated fact that the deceased was unlawfully killed by the defendant. When the evidence is viewed in the light of the applicable law, the conclusion must be reached that the jury was warranted in determining that the defendant committed a wilful, deliberate and premeditated killing within the meaning of the statutory definition of murder of the first degree. (Pen. Code, § 189.) With that determination this court is not free to interfere.

The appeal from the order denying the motion for a new trial is dismissed. The judgment is affirmed.

Shinn, P. J., and Files, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 14, 1963.