[Crim. No. 11912.   Second Dist., Div. One.   July 12, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND ROBERT CLARK, Defendant and Appellant.

Maxwell S. Keith, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jerold A. Prod, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of murder in the first degree.

In an information filed in Los Angeles County on December 31, 1964, defendant was charged with murdering Marshall Allen Taylor on December 5, 1964. (Pen. Code, § 187.) A jury trial was duly waived and the judge found defendant guilty of murder in the first degree and sentenced defendant to the state prison for the term of his natural life. A motion for new trial was denied. A timely notice of appeal was filed.

A résumé of some of the facts is as follows: In March 1964, defendant and a friend, Gary Prothero, rented an apartment, which was located over a garage, from Mr. and Mrs. Taylor. The Taylors had two sons. One of the boys, Marshall, aged 14, was engaged by defendant in a homosexual love affair. Defendant and Marshall went to movies on weekends and on occasions Marshall spent the night in the apartment and slept with defendant.

Prothero and defendant were employed at Best Lathing Company. Prior to December 5, 1964, work was slack and they worked only a day or so a week. Prothero told defendant that he (Prothero) was going back into the Navy. On Monday, prior to the killing of Marshall, defendant asked Mrs. Taylor if he could stay in the house after Prothero went into the Navy and she replied in the negative.

On the evening of December 4, 1964, defendant gave Prothero $7 to spend the night elsewhere and, in effect, told Prothero that he did not want him around the apartment that night. Defendant stated that he was going to tell Marshall that he (Clark) was going to leave. Prothero thought that this might generate an argument and perhaps some trouble, and he did not want to be around the apartment. Prothero spent the night in a hotel in Long Beach.

Prothero returned to the apartment at about 9:30 a.m., December 5, 1964. The door to the apartment had two locks on it, one near the door knob and a second one which was activated with a separate key. Ordinarily defendant and Prothero used the doorknob lock. However, when Prothero went to enter the apartment the second lock was engaged and he was unable to gain entrance to the apartment. Prothero went downstairs and had a cup of coffee and talked with Mrs. Taylor for about an hour. He went back to the apartment and again tried the door and again found it locked. At this time he smelled gas whereas he had not the first time he had been at the door. He then went downstairs to Mrs. Taylor's house and asked for a key to the second lock on the door. He secured the key and entered the apartment. The smell of gas was

much stronger. Prothero noticed defendant lying in the hallway covered with a blanket, his head close to a gas jet. Prothero turned off the gas, moved defendant's head, and knew then that defendant was alive because he could see him breathing.

Prothero went downstairs and told Mrs. Taylor to call an ambulance. Prothero returned to the apartment and discovered the body of Marshall lying on the livingroom floor next to a couch bed. Marshall was dressed in shorts, which were inside out and backwards. There was a great deal of blood about Marshall's head. Prothero, knowing that Marshall was dead, went downstairs and told Mrs. Taylor.

Defendant has blood type ''A.'' Marshall had blood type ''B.'' Marshall's blood was in a dried condition, whereas the blood about defendant was fresh when Mr. Klein, a Long Beach criminologist, arrived at the apartment. There were substantial areas of dried blood on the walls and ceiling of the living room. Type ''B'' blood was found on a piece of iron pipe which was located underneath the couch bed. A coffee table in the living room was split in several places and had numerous tool marks on it. The table appeared to have been damaged by a force which could have been caused by blows from the iron pipe. Particles of bone and several hairs were present on the iron pipe and in other places in the general area of Marshall's body. Marshall, in addition to having a fractured skull and having suffered a cerebral contusion, suffered two broken fingers.

Prothero had never seen a piece of pipe around the apartment before. Mr. Taylor had seen a similar piece of pipe under the stairway leading up to the garage apartment. A razor blade also was found which had some type ''A'' blood on it.

A note was found under the lid of the stereo which read: ''We will always be together now.'' and signed ''Marshall Allen Taylor, Raymond Robert Clark. The body of the note was written by defendant. The signatures were those of Marshall and the defendant. Frequently Marshall had signed his name on blank pieces of paper and Mrs. Taylor had thrown away many such papers.

That defendant had beaten Marshall to death with the piece of iron pipe is not questioned. The defendant had told a Mrs. Joyce Clark (no relation) that Marshall knew that he (defendant) was going to kill him, but Marshall was not to know of when such was to take place. The defendant had

homosexual relations with David Clark (no relation), the son of Joyce, a boy of twelve years, about five or six times commencing a few years previously.

Joyce Clark further testified that defendant had stated that ''he was waiting for second degree so he could get off in seven years, get life and he would get out in seven years. He would plead guilty then . . . he was waiting for them to come down to the second degree murder and then he would get life in prison and get out in seven years . . . that he did not want the gas chamber.''

Appellant called as his witness a psychiatrist who testified that he had visited with appellant while appellant was in jail and had asked him some questions and had reviewed some records with reference to appellant. The doctor stated that in his opinion appellant had regressed to a primitive level of functioning on the night of the murder, that he was markedly disturbed in his thinking and behavior, and that he had not premeditated the act of killing Marshall. The doctor stated that in large part his opinion was formed from what appellant told him. Further, the doctor testified that he did not ask any specific questions of appellant with reference to the preliminary examination record, that appellant had not told him why the relationship between Marshall and himself was to be broken, that he did not ask appellant if what he had related to him was the truth, that he had not asked appellant why the appellant was going to leave Marshall, that appellant may have been drunk (although there is no evidence to support such a view), that he did not ask appellant if he had hit Marshall on the head with a piece of pipe, and that it was not necessarily important to him (the doctor) to ask or elicit any answer to such a question.

Appellant now asserts that the evidence is insufficient, as a matter of law, to show deliberation and premeditation, that his statements to the doctor were admissible only to show the basis of the doctor's opinion and should not be considered as evidence of premeditation, that his statements to Joyce Clark were inadmissible in that no admonition with reference to his constitutional rights preceded the conversation.

There is no merit to any of appellant's contentions.

■ Direct evidence of a deliberate and premeditated purpose to kill is not required. The elements of deliberation and premeditation may be inferred from proof of such facts and circumstances which furnish a foundation for such inferences. (See *People* v. *Hillery*, 62 Cal.2d 692, 703 [44 Cal.Rptr.

30, 401 P.2d 382] ; *People* v. *Brubaker,* 53 Cal.2d 37, 40 [346 P.2d 8].) In *People* v. *Lewis,* 217 Cal.App.2d 246, 259 [31 Cal.Rptr. 817], it is said: " 'The presence of premeditation or the absence thereof is to be determined from a consideration of the type of weapon employed and the manner of its use; the nature of the wounds suffered by the deceased; the fact that the attack was unprovoked and that the deceased was unarmed at the time of the assault; . . . and any other evidence from which an inference of premeditation may be reasonably drawn." No specific interval of time has been established as being the minimum time within which deliberation and premeditation can take place.

Appellant relies in part upon what is stated in *People* v. *Caldwell,* 43 Cal.2d 864 [279 P.2d 539] with reference to the view that multiple acts of violence standing alone do not establish premeditations and deliberations. The record in this case demonstrates that there were many circumstances other than the multiple blows which establish that appellant deliberately and with premeditation murdered Marshall. Among other things, the record recites that during their prior relations there were no violent quarrels, that the type of weapon used in this case (a piece of iron pipe) was not in the apartment and obviously appellant had to go and get it and bring it back to the apartment. The wounds suffered by Marshall were not the result of aimless swinging of the pipe but were located and centered where the blows would be lethal. There was a complete absence of provocation. Appellant failed to secure medical attention for Marshall and he obviously attempted to conceal the murder weapon. Further, there was the vicious form and the obviously long duration of the assault, the manner of using the weapon, the fact that the victim was undressed at the time, all of which facts add up to inferences that appellant set about to kill Marshall. Furthermore, appellant told Prothero not to be in the apartment on the night of the murder and gave him $7 to stay away and appellant locked the door so that Prothero could not get in. And, too, appellant told Joyce Clark that Marshall knew that he, appellant, was going to kill him sometime. In other words, not only did appellant deliberate on the matter, he communicated to the victim his thoughts as to what was to occur.

There is at least a clear inference that Marshall resisted the act as best he could (suffered two broken fingers), was killed by appellant by blows on the head with the iron pipe (which appellant had to go out and get), that appellant put Mar-

shall's underwear shorts back on him (inside out and backwards) and then hid the pipe under the couch bed.

Appellant next asserts that the admissions made to his psychiatrist are not admissible as evidence of premeditation. The appellant in this case was represented by counsel at all stages of the proceedings; presumably, he saw the psychiatrist at the request of his own attorney. Had appellant desired that his psychiatrist not be questioned, he could have accomplished such by not calling his doctor as a witness. The exclusionary rules as developed are not designed to prevent the use of all incriminating statements but only when such statements are improperly obtained by an agency of law enforcement. There is no evidence of any violation of any constitutional right of appellant. (See *People* v. *Price*, 63 Cal.2d 370, 378-379 [46 Cal.Rptr. 775, 406 P.2d 55].) The doctor here was not a court-appointed psychiatrist and no error was committed under the circumstances in receiving the doctor's testimony.

The statements of appellant to Mrs. Joyce Clark were properly admitted into evidence. She was not a representative or agent of any branch of law enforcement and, accordingly, appellant was not entitled to any recitation of his constitutional rights before talking with her. There was no police interrogation involved and what was said was completely voluntary. (See *People* v. *Price, supra,* 63 Cal.2d 370, 379.)

There is no prejudicial error in the record in this case.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.