Filed 4/21/23 P. v. Horton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>   v.<br><br>DAMION MARC HORTON,<br><br>      Defendant and Appellant. | C096171<br><br>(Super. Ct. No. 19FE000631) |

A jury found defendant Damion Marc Horton guilty of first degree murder and being a felon in possession of a firearm. It also found true he discharged a firearm causing great bodily injury or death. After the trial court found the prior strike allegation true, it sentenced defendant to 75 years to life plus a determinate consecutive term of 16 months in prison. Defendant argues: (1) insufficient evidence supports the jury's finding of premeditation and deliberation; (2) the trial court erred in refusing to dismiss his prior strike pursuant to his *Romero*[1] motion; and (3) the trial court erred in failing to dismiss

---

[1] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

1

the firearm enhancement pursuant to the amendment of Penal Code[2] section 1385 by Senate Bill No. 81 (2021-2022 Reg. Sess.). We shall affirm. Due to a clerical error in the abstract, we shall order the clerk to correct the abstract of judgment to indicate the sentence imposed for being a felon in possession of a firearm is 16 months, not 16 years.

## BACKGROUND

A second amended information charged defendant with first degree murder and alleged he intentionally and personally discharged a firearm causing great bodily injury or death. (§§ 187, subd. (a), 12202.53, subd. (d).) The information further charged defendant with being a felon in possession of a firearm. (§ 29800, subd. (a)(1).) Finally, the information alleged defendant had a prior strike conviction for an attempted robbery (§ 664/211), which brought him within the three strikes law (§§ 667, subds. (b)-(i) & 1170.12).

The victim, Dajha Richards, met and started dating defendant in late 2016 when she was a junior in high school, and defendant was 18. In September 2018, Dajha gave birth to defendant's son, K.

Defendant shot and killed 18-year-old Dajha in January 2019. At the time of her death, Dajha and her son lived with many other people in her grandmother's home, including her grandmother, her aunt and her aunt's four children, her mother, her mother's husband and their two children, and others.

When Dajha first met defendant, she was outgoing and happy. After they started dating, Dajha became less happy and distanced herself from her family. Dajha had sickle cell anemia. She smoked marijuana on a daily basis in the garage to relieve her pain.

### A. The Murder

The night before the murder, defendant visited Dajha at her grandmother's home to see K. He brought a backpack with him.

---

[2] Undesignated statutory references are to the Penal Code.

2

The last time Dajha's grandmother saw Dajha that night, her grandmother thought Dajha looked like she had been in a fight. Her grandmother also noticed a bruise on Dajha's buttocks. Dajha explained away the bruise by telling her grandmother she bruises easily. During the night, Dajha left K. with her grandmother in her grandmother's room. Sometime around midnight, defendant came into Dajha's grandmother's room and took K.

The next morning, Dajha's aunt testified she left the home at 7:45 a.m. The only other people she saw in the home were Dajha's 12-year-old brother, B.R., and Dajha's grandmother.

Dajha's grandmother knocked on Dajha's bedroom door. When Dajha stuck her head out, her grandmother asked if Dajha had company over. Dajha responded she did, and her grandmother reminded Dajha that defendant was not supposed to stay overnight. She told Dajha she wanted Dajha's "company" gone when she got back from church and then left.

B.R., who was 12 years old at the time of the shooting, was in Dajha's room babysitting K. at Dajha's request and playing a video game. B.R. saw Dajha and defendant look for her cell phone in her room before he saw them go into the garage.

At trial, B.R. testified he heard "bumping and stuff" from the garage but did not remember hearing an argument or voices. He described the noises as two or three bumps on the garage door and then a single gunshot. On the day of the shooting, B.R. told an investigating officer he also heard arguing prior to the gunshot. Dajha ran out of the garage into her room and told B.R., "He shot me." Defendant was behind her with a gun in his hands.

B.R. testified defendant said, "I didn't mean to do it." He also said, "I'm sorry" to Dajha. Defendant did not try to help Dajha after he shot her. B.R. told defendant to get out, and defendant ran away with the murder weapon. B.R. helped Dajha to the living room and then went outside to get help.

3

At around 8:00 a.m. that morning, a pool contractor working nearby saw a young boy come out of the house and say, "She's been shot." Within a minute, the contractor saw another young man, who was 18 to 20 years old, run out of the house, tell him, "I didn't do anything wrong," and then sprinted away. Video and photographic surveillance obtained after the murder shows defendant running from the scene.

Shortly thereafter, B.R. used the contractor's cell phone to call 911 because B.R. could not use Dajha's locked cell phone. The contractor went inside the home and saw a bullet wound in Dajha's chest and scratches on Dajha's shoulder and neck. The scratches appeared fresh.

A sheriff deputy received a call to the house at 9:04 a.m. and went to the residence. He saw Dajha on the couch with a gunshot wound to her chest. Dajha identified defendant as the person who shot her. B.R. told the deputy, "He didn't mean to."

Dajha was pronounced dead at the hospital at 9:29 a.m. She died from a single gunshot wound to the chest. The wound pattern indicated the gun was in direct contact with or very close to her skin. The trajectory of the bullet was front to back, right to left, and downward. The coroner also noticed blunt force trauma to Dajha's neck and collarbone and well-healed scars on Dajha's wrists, shoulders, upper chest, and neck. The coroner also observed recent scratches and a bruise on Dajha's chest and a bruise under her chin.

When the officers searched the home, they found defendant's backpack in Dajha's room but did not find the murder weapon. They also recovered Dajha's cell phone in the living room. Officers could not locate defendant or the firearm in the neighborhood, even utilizing canines.

The cell phone had photographs of Dajha taken the day before defendant killed her while she was wearing the same shirt she was wearing when he shot her. In those photos, her chest was free of any scratches. An additional photograph taken at the scene of the

4

murder within five minutes of defendant shooting her shows fresh scratches on her chest and a red splatter on her shirt.

Defendant turned himself in the next day. The murder weapon was never found.

### B.      *Defendant's Testimony About the Murder*

Defendant testified on his own behalf. He said he bought the gun from an unknown man for $300 three weeks prior to shooting Dajha. Defendant said he spoke with Dajha about buying it, and she gave him half of the money for the purchase. He could not remember anything about the person who sold it to him.

A few days prior to the murder, he put the gun in the backpack he brought to Dajha's home. Defendant admitted he chose to bring the gun with him the day before the murder, despite the fact he could have left it at home. Defendant further testified he never shot the gun, loaded the murder weapon with ammunition, checked it for ammunition, or tested whether it worked. But, he saw the gun was loaded.

The evening before the murder, defendant and Dajha went into the garage to smoke some marijuana. Defendant took the gun out of his backpack and placed the gun on the floor of the garage under the front tire of a car. He claimed he put the gun on the floor in the unlocked garage because there were six small children in the house.

After spending time smoking, listening to music, and taking pictures in the garage, the two went to Dajha's room. Later, at Dajha's request, defendant went to Dajha's grandmother's room to retrieve their son.

The next morning, the two retreated to the garage to smoke some more marijuana. After the two smoked some marijuana, defendant asked Dajha to go get his backpack out of her room. While she was gone, he retrieved the gun from under the car and was holding it in his hand waiting for her to return.

When Dajha returned, she asked him something about rent money. Defendant claims he "started being funny. . . . I'm, like, she could have just told me she wanted some rent money. I'm like -- as a matter of fact, I think I'll get some rent money. I was

being funny." He described this as a regular conversation and said no one was angry. While he was doing this, he was holding the gun in his right hand next to his head with it pointed in the air and shaking it around, while Dajha was a foot or two in front of him. Defendant claimed she "grabbed" for the gun and told him, "Don't go do nothing stupid." Defendant, who is six feet one inch tall, claimed Dajha, who was five feet three inches tall, grabbed his hand with the gun and pulled it down. When he tried to pull it back, he said, "Watch out." As he pulled back, defendant claims the gun went off. Defendant claimed he grabbed Dajha under the arm but she started walking away by herself. He followed Dajha into the house and kept repeating, "I'm sorry. It was an accident." Defendant could not explain the fresh scratches on Dajha's chest.

Defendant said he left the scene because he was scared. He did not call an ambulance or ask anyone else to do so. Instead, he left Dajha to die with her four-month-old son and 12-year-old brother. He claimed the murder weapon fell out of his pocket while he was running away.

When he turned himself in the next day, he had on fresh clothes.

### C.    Prior Domestic Violence Incidents

The People presented evidence that defendant engaged in repeated violence and threats towards Dajha and her family, however, Dajha never reported those incidents to law enforcement.

At one point, Dajha's mother remembered hearing arguing and yelling coming from Dajha's room, and when she went in she saw food everywhere, including on the ceiling. Dajha and defendant had been arguing because Dajha would not give defendant the passcode for her cell phone. In another incident in 2017, defendant's cousin saw defendant push Dajha very hard in the chest. Defendant testified this did not happen.

Dajha's grandmother noticed bite marks and burn marks on Dajha's back and neck after she started dating defendant. Dajha's mother noticed scratches on her neck and chest. When asked, Dajha told her mother the scratches were from her medication.

6

Around April 2017, Dajha was at the hospital due to a sickle cell anemia pain crisis. Just prior to and during that visit, her grandmother and hospital personnel observed burn marks, scratch marks, and bite marks on Dajha's back.

During this hospital stay, Dajha and her best friend engaged in a text message conversation. Dajha texted her friend, "[T]hey seen hella bruises on my body. They want to get CPS involved. I don't know what the fuck to tell these people." Dajha's friend urged Dajha to report the domestic violence if defendant had committed it. Dajha responded she was not going to "snitch" and did not want to be the reason they took defendant to jail. Dajha shared she felt "so stupid," and told her friend how defendant treated her nicely "until the demons started coming out." When the social worker questioned her, Dajha said she and her ex-boyfriend had gotten into a fight, and he had bitten her, but declined to share the boyfriend's name and assured the social worker she was no longer in a relationship with him.

About a year before K. was born, Dajha's grandmother heard her call out for her from her room. Dajha's aunt heard Dajha say, "Stop hitting me, do not hit me." When Dajha's grandmother and aunt went into the room, Dajha was angry, crying, and told her grandmother defendant had tried to suffocate her into the mattress. At trial, defendant denied ever suffocating Dajha against a mattress.

When Dajha was six or seven months pregnant, defendant and Dajha got into a verbal altercation. Dajha's grandmother told him to leave. Defendant left but returned with his uncle and told Dajha's grandmother her family would be wearing Dajha on a T-shirt (suggesting she would be deceased) and that he had a gun in his backpack.

While she was pregnant with K., Dajha texted defendant confronting him about punching her in the stomach and kicking her when she was pregnant. Defendant did not deny he committed these acts in the text exchange, but at trial denied he punched her or kicked her in the stomach.

7

When Dajha was giving birth, police responded to the labor and delivery floor at the hospital because of a report of a fight between defendant and Dajha's mother. Defendant was angry with Dajha and her mother and they had gotten into a verbal altercation. The officer removed defendant from the property and revoked his visitation rights.

Dajha's cousin testified Dajha showed her a video of defendant in October 2018. In the video, defendant said if she was not going to let him see his son, then something was going to happen. Dajha's aunt described the video as defendant saying if he ended up in jail, he would be in jail for murdering Dajha and her mother. Defendant testified he made the video shortly after being ejected from the delivery room because he was hurt. Despite the language he used, he claimed he was not threatening anyone.

After Dajha gave birth to K., her grandmother saw a video on Instagram of defendant holding a gun in his hand. In this video, defendant said he was "going to smoke that nigga and he was going to smoke that bitch next." Dajha's mother also saw the video. Defendant admitted this was a meme he created. Defendant read the meme to the jury from the exhibit and it said, "Cheat if you want and he getting smoked and bitch your [*sic*] next." Dajha reposted this meme on her own Instagram account with the caption, "When he's crazy as F, or as fuck, but I love it."

When K. was about four weeks old, defendant came to the house and asked to see the baby. When Dajha's grandmother said he could not come in, defendant asked for Dajha's aunt's husband to come outside while patting his backpack. Dajha's aunt felt this was a threat because she had heard defendant say he had a gun, and that he kept it in his backpack. At trial, defendant denied ever telling anyone he had a gun.

While defendant denied inflicting bite marks or scratches on Dajha, he later admitted he might have scratched her arms. He also admitted he physically abused Dajha during their relationship. Once, he pushed her so hard, she cut her hand requiring a bandage. Dajha's mother characterized this wound as appearing to have been inflicted by

8

a belt buckle. In a text message about breaking off their relationship, defendant admitted Dajha told him not to put his hands on the next woman he dates when he gets angry.

The prosecution presented the testimony of an expert on intimate partner violence. That witness defined domestic violence as a repeating pattern of abuse against an intimate partner with the goal of having power and control over them. The cycle has three phases: (1) tension building that the victims describe as walking on eggshells, (2) a cued episode of abuse, and (3) the honeymoon phase where the abusers apologize to the victims, promise it will never happen again. The expert testified victims rarely call the police and often stay with their abuser. Victims often become withdrawn, less socially interactive with friends and family, and become depressed. Victims also hide the violence and injuries from their family members.

### D. Verdict and Sentencing

The jury found defendant guilty of first degree murder and that he personally used and discharged a firearm causing great bodily injury or death. It also found him guilty of being a felon in possession of a firearm. The trial court found the prior strike allegation true.

Defendant moved to dismiss the prior strike allegation in the interest of justice under section 1385, subdivision (a). He also moved to dismiss the firearm enhancement under section 1385, subdivision (c). The trial court denied both motions. As to the strike allegation, the trial court observed defendant was a 24-year-old man whose short life had been filled with crime since 2015. Defendant started with fights at school, graduated to attempted armed robbery where defendant and his accomplice beat a woman into the ground while carrying guns, moved on to beating and abusing Dajha over the course of two years of their dating relationship, and ultimately killed her. The court found significant that defendant carried a gun around when he was prohibited from possessing one.

9

Based on this history, the trial court found defendant's prospects for reform were "pretty much zero." The court found defendant's crimes were violent, the prior strike was close in time to the current offense, and defendant was a danger to society who would "no doubt" reoffend. The trial court found no mitigating circumstances other than defendant's age. The court summed up its analysis by stating: "[A]ll in all, when I consider the circumstances surrounding not only you, your rights, your constitutional rights, your interests, who you are as a person and balance that against the type of crime this is and the danger to society, I have to ask myself, are you in the spirit of the three strikes law? Is this what the three strike law was designed for, someone like yourself? And I think the answer is absolutely yes. It is an alternative sentencing scheme designed to punish someone like yourself differently than other people because of what you have done in the past."

The trial court also denied defendant's request to dismiss the firearm enhancement. The trial court found section 1385, subdivision (c) applied to this enhancement and the section required the trial court to give great weight to the mitigating factor this would result in a sentence over 20 years. But, the trial court noted that presumption could be overcome if it found the dismissal of the enhancement would endanger public safety. The trial court found defendant was a person who has shown a pattern of using firearms to intimidate and threaten others, intimidate witnesses, and kill the victim here. The court noted the jury's finding the killing was premeditated and deliberate and expressed its disbelief at defendant's story he put the gun on the floor under the car to protect children—calling that story "absolutely ludicrous." Thus, the court found striking the enhancement would endanger public safety because there was clear and convincing evidence a dismissal would result in or could result in physical injury to others.

The trial court sentenced defendant to 25 years to life on the murder charge doubled to 50 years to life for the prior strike and added a 25-year-to-life sentence for the

10

firearm enhancement. As to the charge of being a felon in possession of a firearm, the trial court imposed one-third the middle term doubled to 16 months[3] consecutive to the 75-year-to-life sentence.

Defendant timely appealed.

## DISCUSSION

### A. *Substantial Evidence of Premeditation and Deliberation*

Defendant argues the evidence admitted at trial was insufficient to demonstrate he premeditated and deliberated before he killed the victim. We disagree.

In determining whether sufficient evidence supports a conviction, " 'we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] . . . "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We do not reweigh evidence or witness credibility. (*Ibid*.)

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. (§ 189 ['willful, deliberate and premeditated killing' as first degree murder].) 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) " ' "The process of premeditation and deliberation does

---

[3] We note the abstract of judgment identifies this as 16 *years* instead of 16 *months*. The trial court's oral pronouncement prevails. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We shall order this corrected.

not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 276.)

We ordinarily consider "three factors commonly present in cases of premeditated murder: '(1) [F]acts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing--what may be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' " (*People v. Koontz, supra*, 27 Cal.4th at pp. 1080-1081, quoting *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Those guidelines—referred to as the *Anderson* factors—"are descriptive and neither normative nor exhaustive," so "reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

We conclude this is a close case because the only two witnesses present when defendant shot Dajha were defendant and Dajha. Viewing the evidence in the light most favorable to the judgment, however, we conclude a rational trier of fact properly could have found defendant killed the victim with premeditation and deliberation beyond a reasonable doubt.

The jury could reasonably infer defendant engaged in planning activity related to this murder. First, he bought the gun just three weeks before he killed Dajha. Second, he brought that gun to Dajha's grandmother's house and placed it on the garage floor the night prior to shooting the victim. (*People v. Haskett* (1982) 30 Cal.3d 841, 850 [bringing a weapon to the murder supports the finding of premeditation and deliberation]; *People v. Horning* (2004) 34 Cal.4th 871, 902 [same].) Defendant claimed he placed the gun on the ground because he was trying to keep it away from small children, which makes no sense on its face, but made it easily accessible to him at the time of the murder in a place where there were no eyewitnesses. Third, the morning of the murder, defendant waited in the garage until Dajha went back into the house, got the gun out from under the car and shortly after she returned, was holding it in his hand when he shot her.

Prior threats to the victim can also be evidence of premeditation and deliberation in that they justify the inference the murderer thought about killing his victim in the past and had that same mindset when he killed the victim. (*People v. Caldwell* (1955) 43 Cal.2d 864, 869-870; *People v. Martinez* (1987) 193 Cal.App.3d 364, 371.) Here, defendant told members of Dajha's family she would be on a T-shirt, suggesting she would be dead at his hand. He also posted a video saying if he ended up in jail, it would be for murdering Dajha. He posted another video holding a gun saying he would kill someone and his girlfriend would be next. This evidence demonstrates the act of killing Dajha did not occur to defendant for the first time in the garage when he confronted her with a gun.

Moreover, the jury could reasonably infer defendant had a motive to kill the victim based on his two-year history of abusing Dajha and threats to kill her. "[E]vidence showing 'quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense.' " (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 893.)

13

Here, the record disclosed defendant inflicted extensive physical abuse on Dajha in the slightly more than two years during their relationship. He suffocated her, punched her, kicked her, bit her, burned her, hit her, pushed her, and scratched her. As we have noted, defendant posted a meme where he was holding a gun that said he would kill his girlfriend if she cheated, and posted an Instagram video threatening her if he could not see his son. In both veiled and explicit ways, defendant told Dajha, her grandmother, and her aunt that he was contemplating killing Dajha and was willing and able to do so. And he did.

The failure to secure medical help and fleeing with the weapon to conceal it is further evidence of premeditation and deliberation. (*People v. Clark* (1967) 252 Cal.App.2d 524, 529.) Here, after defendant shot Dajha, he ran away. He did not try to help the victim, tell anyone to call the police, or summon any help himself. After he shot her, he left the mother of his child to die with her pre-teen brother and their four-month-old son, jogged away, and the gun he had in the garage, and which he used to shoot Dajha, was never found.

Finally, as to the nature of the killing, defendant fired the gun at point-blank range into the victim's chest and then fled the scene. The jury was entitled to discredit defendant's claim Dajha pulled the gun to her own chest as simply unbelievable. (*People v. Wiest* (1962) 205 Cal.App.2d 43, 46 [the jury's implicit finding it did not credit the defendant's testimony is controlling on appeal].) The disbelief of defendant's testimony did not come in a vacuum. The jury had evidence of the height difference between the defendant and victim, the wound path from right to left from the middle of her chest, the bruise on her chin, and the nature of the wound as a point-blank shooting. It appears more likely the wound path would travel from the victim's left to right had she pulled the gun into her chest from his right hand. This evidence was sufficient for the jury to conclude defendant deliberately and with premeditation put the firearm in the middle of the victim's chest and pulled the trigger, rather than the version of events defendant gave

14

on the stand about rent money. Defendant's point-blank gunshot to Dajha's heart shows a calculated design to ensure death rather than an unconsidered explosion of violence. (Cf. *People v. Horning*, *supra*, 34 Cal.4th at p. 902 [single gunshot to the head showed calculated design to ensure death].)

The jury could have believed defendant's story he did not engage in premeditation and deliberation before he killed Dajha, however, it did not. We conclude substantial evidence supports its finding of premeditation and deliberation.

### B.     Romero Motion

Defendant argues the trial court abused its discretion when it denied his *Romero* motion. In particular, defendant points to his young age and the science of brain development and argues the trial court failed to take into account these factors when assessing his culpability. Further, he points to his limited contact with his father as a child, his unsettled upbringing, his completion of high school, his lack of mental health issues and drug or alcohol abuse, and his remorse for killing the mother of his child. Defendant has not shown the trial court abused its discretion in refusing to dismiss his strike prior.

Our Supreme Court held in *Romero* trial courts have discretion under section 1385 to dismiss a prior strike when that court finds a defendant falls outside the spirit of the three strikes law. (*People v. Superior Court (Romero), supra*, 13 Cal.4th at pp. 529-530.) The court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) A trial court's refusal "to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) Where the trial court, aware

of its discretion, " 'balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*Id.* at p. 378.)

"[A] prior conviction may be stricken if it is remote in time." (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.) In determining whether a prior conviction is remote, the trial court should evaluate whether the defendant has had a "crime-free cleansing period of rehabilitation after a defendant has had the opportunity to reflect upon the error of his or her ways." (*Ibid.*)

Here, to the extent defendant attempts to raise new arguments regarding the brain development of young people for the first time on appeal, he forfeited those arguments by failing to make them in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 351; *People v. Scott* (2015) 61 Cal.4th 363, 406.)

As to the remaining issues properly before the trial court, we conclude it did not abuse its discretion. The trial court understood its discretion and correctly stated its obligation to look at the totality of the circumstances in making this decision. The trial court reviewed the motion filed by defendant containing each of the factors he asserts justify striking this strike conviction. The court considered the circumstances surrounding defendant and who he was as a person. When it engaged in that consideration, the trial court observed this 24-year-old defendant's life has been filled with crime since 2015. From that day forward, he increased the level of violence he inflicted on others until ultimately he killed Dajha.

As to his prior strike conviction, defendant beat the victim in the attempted robbery, punching her in the face repeatedly while armed with a gun. Less than two years after that, defendant beat Dajha over the period of their relationship before he killed her. The trial court noted defendant continued to possess and use guns despite the fact he was legally prohibited from doing so.

16

Based on this, the trial court found defendant's prospects for reform were "pretty much zero," his "crimes just got more serious" after court intervention and defendant was a danger to society who would "no doubt" reoffend if he was ever to be released. The court also noted the prior strike was both close in time to the current crime and violent. The trial court found no mitigating circumstances other than defendant's age, and found defendant fell within the spirit of the three strikes sentencing scheme. This determination was within the trial court's discretion.

### C.    Motion to Strike Firearm Enhancement

Defendant argues section 1385, subdivision (c)(3)(C) required the trial court to dismiss the enhancement for intentionally and personally discharging a firearm causing great bodily injury or death (§ 12202.53, subd. (d)). We disagree.

"In 2021, the Legislature enacted Senate Bill No. 81 (2021-2022 Reg. Sess.) . . . , which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (Stats. 2021, ch. 721, § 1.)" (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

Subdivision (c)(1) of section 1385 as amended provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Subdivision (c)(2) of section 1385 provides in relevant part: "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." The pertinent factor here is contained in subdivision (c)(2)(C) of section 1385: "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed."

17

Taken together, these provisions provide the trial court with the discretion to decide not to dismiss the enhancement due to the mitigating factors in section 1385, subdivision (c)(2), if the court finds the dismissal of the enhancement would endanger public safety. (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 18; *People v. Walker* (2022) 86 Cal.App.5th 386, 391, review granted Mar. 22, 2023, S278309.) Here, the trial court acknowledged its obligation to give great weight to this mitigating factor, but found dismissal of this enhancement would endanger public safety in this case. Defendant does not challenge this factual finding on appeal. Thus, the trial court properly declined to strike this enhancement.

DISPOSITION

The judgment is affirmed. The clerk of the trial court is directed to prepare a corrected abstract of judgment setting forth defendant's orally imposed sentence of 16 months in prison for being a felon in possession of a firearm and forward a certified copy to the Department of Corrections and Rehabilitation.

/s/ _____<br>BOULWARE EURIE, J.

We concur:

/s/ _____
DUARTE, Acting P. J.

/s/ _____
McADAM, J.*

_____

* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.